194 N.J. Super. 418 (1984)
477 A.2d 352
PETER SHAPIRO, ESSEX COUNTY EXECUTIVE AND THE COUNTY OF ESSEX, A BODY CORPORATE AND POLITIC, APPELLANTS,
v.
GEORGE J. ALBANESE, COMMISSIONER OF THE NEW JERSEY DEPARTMENT OF HUMAN SERVICES, RESPONDENT.
Superior Court of New Jersey, Appellate Division.
Argued January 30, 1984.
Decided April 16, 1984.
*420 Before Judges ARD, MORTON I. GREENBERG and TRAUTWEIN.
Allen Zaks, Assistant County Counsel, argued the cause for appellants (David H. Ben-Asher, Essex County Counsel, attorney; Allen Zaks and Michelle C. Hollar-Gregory, Assistant County Counsel, and on the brief).
Dorothy Donnelly, Deputy Attorney General, argued the cause for respondent (Irwin I. Kimmelman, Attorney General, attorney; James J. Ciancia, Assistant Attorney General, of counsel, and Dorothy Donnelly, on the brief).
The opinion of the court was delivered by ARD, P.J.A.D.
The primary question involved in this appeal is whether Circular Letter No. 82-8-3 sent to county welfare agency directors and county child support and paternity fiscal unit supervisors by the Department of Human Services is in violation of the Administrative Procedure Act (N.J.S.A. 52:14B-1 et seq.).
*421 A corollary to this question is whether 42 U.S.C.A. § 658(a) and the federal regulations implementing this statute prohibit the allocation of intercept monies between the State and the County of Essex. Stated another way, the issue is whether the State of New Jersey has the right to share in child support collection incentive payments heretofore paid to the counties by the federal government based upon the amounts of support which the counties collect from absent parents of recipients of grants paid under the Aid to Families With Dependent Children Program (A.F.D.C.).
Certain background information is essential to an understanding of the issues involved. The A.F.D.C. program is an aid and assistance program established by the Social Security Act of 1935 which is directed towards dependent children who are defined as age-qualified needy children who have been deprived of parental support or care and who are living with any of several listed relatives. Participation in the jointly-funded A.F.D.C. program is dependent on state conformity with the requirements of the Social Security Act (42 U.S.C.A. § 601 et seq.) and the regulations promulgated thereunder by the Department of Health and Human Services (45 C.F.R. § 201 et seq.).
New Jersey elected to participate in the A.F.D.C. program and in 1959 adopted its plan of Assistance for Dependent Children (A.D.C.). N.J.S.A. 44:10-1 et seq. The A.F.D.C. program is administered in New Jersey by the county welfare agencies, N.J.S.A. 44:10-2, subject to supervision by the Commissioner of Human Services, N.J.S.A. 44:10-3, who has adopted general policies, rules and regulations to carry out the purposes of the A.F.D.C. and A.D.C. laws. N.J.A.C. 10:81-1 et seq.
Section 664(a) of Title 42 of the United States Code contains the procedure for collection of past-due support from federal tax refunds. That section provides:

*422 Upon receiving notice from a State agency administering a plan approved under this part that a named individual owes past-due support which has been assigned to such State pursuant to section 602(a)(26) of this title, the Secretary of the Treasury shall determine whether any amounts, as refunds of Federal taxes paid, are payable to such individual (regardless of whether such individual filed a tax return as a married or unmarried individual). If the Secretary of the Treasury finds that any such amount is payable, he shall withhold from such refunds an amount equal to the past-due support, and pay such amount to the State agency (together with notice of the individual's home address) for distribution in accordance with section 657(b)(3) of this title.[[1]]
The federal government, interested in recouping monies from the persons ultimately responsible for the support and care of these children, enacted certain laws to provide incentives for recoupment. Thus, to increase support collections, Congress enacted 42 U.S.C.A. § 658(a) which provides an incentive or bonus to the entity doing the collecting and enforcing of A.F.D.C. support cases in state programs. That section provides:
When a political subdivision of a State makes, for the State of which it is a political subdivision or one State makes, for another State, or a State on its own behalf makes,[[2]] the enforcement and collection of the support rights assigned under section 602(a)(26) of this title (either within or outside of such State), there shall be paid to such political subdivision, such other State, or such State (in the case of a State which on its own behalf makes such enforcement and collection) from amounts which would otherwise represent the Federal share of assistance to the family of the absent parent an amount equal to 15 percent[[3]] of any amount collected and required to be distributed as provided in section 657 of this title to reduce or repay assistance payments.
The tax offset program created under 42 U.S.C.A. § 664 operates in New Jersey as part of the child support and paternity unit (C.S.P.) described by N.J.A.C. 10:81, Appendix D, effective July 1, 1975. As part of the 1975 C.S.P. program a *423 15% incentive for county efforts was authorized. N.J.A.C. 10:81, Appendix D, Section 241 and 42 U.S.C.A. § 664.
As indicated, this appeal arose when the respondent, the director of the Division of Public Welfare, Department of Human Services initiated a new division of the 15% incentives attributable to the tax setoff programs. Although the duplicate incorporated in appellants' appendix is less than clear, it reads as follows:
 August 10, 1982
 Circular Letter No. 82-8-3
 TO: COUNTY WELFARE AGENCY DIRECTORS
 COUNTY CHILD SUPPORT AND PATERNITY (CSP)
 FISCAL UNIT SUPERVISORS
Subject: Title IV-D Tax Intercept Procedures
In the near future your agency will begin to receive periodic Title IV-D collections from your county probation department and other county probation departments within the State resultant from the tax intercept efforts. In order to facilitate the identification of these amounts, county probation departments have been instructed by the N.J. Administrative Office of the Courts to forward these funds to county welfare agencies separately from regular CSP collections. Due to the modified procedures relative to the recording of these collections, it is necessary that the fiscal activity be reported to the Bureau of Business Services on the attached Form CSP-106A, "Distribution of Tax Intercept Collections" using the following guidelines:
1. All tax intercept collections shall be applied to arrearage balances and shall not be considered when determining AFDC eligibility. No AFDC case shall be closed as the result of a tax intercept collection.
2. An amount equal to one-half (7 1/2%) of the incentives applicable to tax intercept collections from within New Jersey will be utilized by the State to offset related administrative costs. Therefore, after Form CSP-106A has been completed, a check shall be prepared payable to "Treasurer, State of New Jersey" in the amount shown on line 5.c. and forwarded to the Bureau of Business Services within this Division.
The remaining format and data elements parallel those of Form CSP-106 "Summary of Receipts, Disbursements and Refunds to Assistance." Attached is an initial supply of the Form CSP-106A. Additional copies are to be reproduced locally. This form must be completed and forwarded to the State office no later than the end of the month following the report month. This information is to be brought to the attention of all appropriate staff. Inquiries may be addressed to Ronald Exner, Supervisor, Child Support and Paternity Fiscal Unit, Bureau of Business Services at (609) 890-9500, extension 305.
*424
 Sincerely yours,
 G. Thomas Riti, Director
 Division of Public Welfare
In sum, the director authorized a 7 1/2% incentive to the county from the tax refunds while retaining 7 1/2% for state expenses and a proposed bonus incentive program. It is the retention of 7 1/2% of the tax refund intercepts which the county challenges. Appellants urge that 42 U.S.C.A. § 658(a) does not authorize allocation of intercept monies between the state and its political subdivision where the latter enforces and collects the support monies. Consequently, the appellants argue that the decision of the commissioner to retain 7 1/2% of the incentive payments attributable to the tax setoff programs is in violation of that statute and the federal regulations implementing the same. It is also contended that the circular letter is in violation of the Administrative Procedure Act (N.J.S.A. 52:14B-1 et seq.) since it is in substance a rule or regulation which was not passed in accordance with the requirements of said act.
The entire record in this matter is embodied in appellants' appendix. An action was not instituted below in the agency, and consequently, there is no record or transcript on appeal. Rather, the matter was initiated by filing a notice of appeal with this court pursuant to R. 2:2-3(a)(2) which provides for review of final decisions or actions of any state administrative agency. However, notwithstanding the sparse record, we have reviewed it in its entirety and have considered the arguments of counsel and conclude appellants are correct in both contentions, namely, the circular letter is in violation of the Administrative Procedure Act (N.J.S.A. 52:14B-1 et seq.) and flies in the face of 42 U.S.C.A. § 658(a) which does not authorize the allocation of intercept monies between the State and the county in the circumstances of this case.
The respondent contends that it is not subject to N.J.S.A. 52:14B-1 et seq. in retaining 7 1/2% of the tax refund incentives because the decision contained in the circular letter is not an administrative rule or regulation but rather an intra- or interagency *425 statement. In addition, the State argues that the retention of 7 1/2% of the tax refund incentives did not amend N.J.A.C. 10:81, Appendix D, Section 241, since the 15% incentives remain payable to the counties which originate from other child support and paternity collections. It contends that the tax intercept monies are kept separate and apart from the other traditional child support and paternity collections, and consequently, the circular letter under review only authorized the State to retain one-half of the tax intercept monies and not the other traditional collections. We disagree. We are satisfied that the circular letter is in fact an administrative rule and is invalid for lack of compliance with N.J.S.A. 52:14B-1 et seq. prior to its promulgation.
Prior to 1980, the Title IV-D plan and federal law provided no method for collection of overdue child support from federal tax refunds. Following the enactment of 42 U.S.C.A. § 664 (federal tax intercept provision), the county and State began to participate in the federal tax program in 1981. The first revenues were received the following year.
As indicated, the tax offset program (42 U.S.C.A. § 664) operates as one part of the child support and paternity unit described in N.J.A.C. 10:81, Appendix D, effective July 1, 1975. Furthermore, as part of the child support and paternity program, the federal government pays incentives in accordance with 42 U.S.C.A. § 658. Pursuant to N.J.A.C. 10:81, Appendix D, Section 241, "[a]n amount equal to 15% of any required support obligation collected shall be retained by the CWA [County Welfare Agency] with the exception of those collections made on behalf of other jurisdictions (intrastate or interstate)." [Emphasis supplied].
Thus, the regulation in question, which was enacted on June 25, 1975, did not contemplate the division of the responsibilities, functions or amount of incentives between the county and State participating in the federal tax program which was enacted on August 13, 1981. However, by the very terms of the regulation, *426 "... 15% of any required support obligation collected shall be retained by the CWA...." After the effective date of the federal intercept tax program, this regulation necessarily regulated the amounts of incentive payable to the counties determined by the amount of federal tax refunds collected. Thus, the circular letter dated March 30, 1983 had the effect of amending N.J.A.C. 10:81, Appendix D, Section 241 since it excepted from its operation 7 1/2% of the incentives attributable to the tax refund program which hereinafter were to be paid to the State. This interpretation or rewriting of the regulation in question was in contravention of the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq.
The regulation in question, N.J.A.C. 10:81, Appendix D, Section 241 was promulgated by the Commissioner of Human Services pursuant to the authority granted by the Legislature in N.J.S.A. 44:10-3 which provides in part:
The Commissioner of Human Services is authorized, directed and empowered to issue, or to cause to be issued by the appropriate departmental officers or agencies, all necessary rules and regulations and administrative orders, and to do or cause to be done all other acts and things necessary to secure for the State of New Jersey the maximum Federal financial participation that is available with respect to a program of aid to families with dependent children and otherwise to accomplish the purposes of this act,[[4]] ...
Pursuant to N.J.S.A. 52:14B-4(a), "[p]rior to the adoption, amendment, or repeal of any rule, ... the agency shall:"
(1) Give at least 30 days notice of its intended action. The notice shall include a statement of either the terms or substance of the intended action or a description of the subjects and issues involved, and the time when, the place where, and the manner in which interested persons may present their views thereon. The notice shall be mailed to all persons who have made timely request of the agency for advance notice of its rule-making proceedings and in addition to other public notice required by law shall be published in the New Jersey Register and shall be filed with the President of the Senate and the Speaker of the General Assembly. The notice shall be additionally publicized in such manner as the agency deems most appropriate in order to inform those persons most likely to be affected by or interested in the intended action. Methods that may be employed include publication of the notice in newspapers *427 of general circulation or in trade, industry, governmental or professional publications, distribution of press releases to the news media and posting of notices in appropriate locations;
(2) Prepare for public distribution at the time the notice appears in the Register a statement setting forth a summary of the proposed rule, a clear and concise explanation of the purpose and effect of the rule, the specific legal authority under which its adoption is authorized, and a description of the expected socio-economic impact of the rule;
(3) Afford all interested persons reasonable opportunity to submit data, views, or arguments, orally or in writing. The agency shall consider fully all written and oral submissions respecting the proposed rule.
The agency shall conduct a public hearing on the proposed rule at the request of a committee of the Legislature, or a governmental agency or subdivision, provided such request is made to the agency within 15 days following publication of the proposed rule in the Register. The agency shall provide at least 15 days' notice of such hearing, which shall be conducted in accordance with the provisions of subsection (g) of this section;
(4) Prepare for public distribution a report listing all parties offering written or oral submissions concerning the rule, summarizing the content of the submissions and providing the agency's response to the data, views and arguments contained in the submissions.
....
(g) All public hearings shall be conducted by a hearing officer who may be an official of the agency, a member of its staff, a person on assignment from another agency, a person from the Office of Administrative Law assigned pursuant to subsection o. of section 5 of P.L. 1978, c. 67 (C. 52:14F-5o) or an independent contractor. The hearing officer shall have the responsibility to make recommendations to the agency regarding the adoption, amendment or repeal of a rule. These recommendations shall be made public. At the beginning of each hearing, or series of hearings, the agency, if it has made a proposal, shall present a summary of the factual information on which its proposal is based, and shall respond to questions posed by any interested party. Hearings shall be conducted at such times and in locations which shall afford interested parties the opportunity to attend. A verbatim transcript of each hearing shall be maintained, and copies of the transcript shall be available to the public at no more than the actual cost.
In addition, N.J.S.A. 52:14B-5 provides:
(a) Each agency shall file with the Director of the Office of Administrative Law a certified copy of each rule adopted by it.
(b) No rule hereafter adopted shall be effective unless it has been deemed to be approved by the Legislature pursuant to section 3 of this amendatory and supplementary act.
(c) The director shall: (1) accept for filing or publication any rule duly adopted and submitted by any agency pursuant to this act; (2) endorse upon the *428 certified copy of each rule accepted for filing pursuant to this act the date and time upon which such rule was filed; and (3) maintain the certified copy of each rule so filed in a permanent register open to public inspection.
(d) The filing of a certified copy of any rule shall be deemed to establish the rebuttable presumptions that: (1) it was duly adopted; (2) it was duly submitted for prepublication and made available for public inspection at the hour and date endorsed upon it; (3) all requirements of this act and of interagency rules of the director relative to such rule have been complied with; (4) its text is the text of the rule as adopted. Judicial notice shall be taken of the text of each rule, duly filed.
(e) The publication of a rule in the New Jersey Administrative Code or the New Jersey Register shall be deemed to establish the rebuttable presumption that the rule was duly filed and that the text of the rule as so published is the text of the rule adopted. Judicial notice shall be taken of the text of each rule published in the New Jersey Administrative Code or the New Jersey Register. [Footnote omitted].
Thus, it is clear from a review of the above sections that the procedures which must be followed to promulgate, amend or repeal an agency rule are quite detailed. Failure to comply with this procedure renders the rule invalid. N.J.S.A. 52:14B4(d). In the case at bar, it is not disputed that respondent failed entirely to comply with the aforementioned statute. Thus, what remains is a determination of whether the circular letter is a rule or regulation or has the effect of amending an existing regulation. The resolution of this issue is essential for it will determine whether the decision of the commissioner contained within the circular letter is subject to the Administrative Procedure Act.
The term "administrative rule" is defined in N.J.S.A. 52:14B-2(e):
"Administrative rule" or "rule," when not otherwise modified, means each agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal management or discipline of any agency; (2) intraagency and interagency statements; and (3) agency decisions and findings in contested cases.
There can be no doubt that the circular letter in question is an agency statement of general applicability (to all county welfare agencies) that implements or interprets law or policy, namely, the federal statutes and regulations as well as N.J.A.C. *429 10:81, Appendix D, Section 241. Further, it amended that section to exempt from its operation 7 1/2% of incentives attributable to federal tax refunds. It is not an intra- or interagency statement as contended by the respondent but rather ad hoc legislation without compliance with the Administrative Procedure Act.
The commissioner's actions under review were clearly in the field of rulemaking since it had the effect of amending a regulation which he previously promulgated. This action is similar to what occurred in Glaser v. Downes, 126 N.J. Super. 10 (App.Div. 1973), certif. den. State v. Powell, 64 N.J. 513 (1974). In Glaser, the Director of Taxation issued a notice to all motor fuel dealers in New Jersey that "giveaways," whether or not conditioned on the purchase of gasoline, were violative of existing law. Under existing regulations, as written and as enforced, such "giveaways" were permissible provided they were not conditioned on the purchase of gasoline. There, we held that the notice was a rule as defined by N.J.S.A. 52:14B-2(e), and also constituted a repeal or amendment of the prior rule. In particular, we found:
The order was in effect a rule or regulation. N.J.S.A. 52:14B-2(e) defines an administrative rule as an "agency statement of general applicability and continuing effect that implements or interprets law or policy * * *. The term includes the amendment or repeal or any rule * * *." The October 2 notice was precisely such an "agency statement," and since it offered an interpretation of N.J.S.A. 56:6-2(e) different from that embodied in the existing regulation, N.J.A.C. 18:19-2(a), it also constituted a repeal or amendment of that rule. It was a directive of universal application, for it was mailed to all licensed motor fuels dealers in New Jersey.
What the Director did violated every requirement of N.J.S.A. 52:14B-4(a), which deals with notice and hearing prior to the adoption, amendment or repeal of any rule. That section requires at least 20 days' notice of the intended action; an opportunity afforded all interested persons to submit data, views or arguments, orally or in writing, and agency consideration of all such submissions. And N.J.S.A. 52:14B-5(a) directs that the agency file with the Secretary of State a certified copy of each rule it adopts.

N.J.S.A. 52:14B-4(d) expressly provides that no rule is valid unless adopted in substantial compliance with the notice and hearing requirements. There was not so much as a shadow of compliance by the Director with the clearly stated requirements of the Administrative Procedure Act. What he did denied due *430 process [sic] of law to the three companies here involved. [Glaser, supra, 126 N.J. Super. at 18-19].
We are mindful that administrative agencies have wide discretion in selecting means to fulfill the duties that the Legislature delegated them. Our Supreme Court made this clear in Texter v. Human Services Dep't, 88 N.J. 376 (1982):
... Agencies may act informally, Shapiro, "The Choice of Rulemaking or Adjudication in the Development of Administrative Policy," 78 Harv.L.Rev. 921, 923 (1965) ("Rulemaking or Adjudication"), or formally through rulemaking or adjudication in administrative hearings. Bally Mfg. Corp. v. New Jersey Casino Control Comm'n., 85 N.J. 325, 338 (1981) (Handler, J., concurring); Boller Beverages, Inc. v. Davis, 38 N.J. 138, 154 (1962).
Classification of agency action, though easy in theory, is often difficult to apply in specific cases. See Cunningham v. Department of Civil Service, 69 N.J. 13, 20 (1975); Boller Beverages, Inc., supra, 38 N.J. at 154; Shapiro, "Rulemaking or Adjudication," 78 Harv.L.Rev. at 924. Compare Anaconda Co. v. Ruckelshaus, 352 F. Supp. 697, 702 (D.Colo. 1972) (individualized rulemaking requires evidentiary hearing) with id., 482 F.2d 1301, 1306-1307 (10 Cir.1973) (APA notice and comment procedure sufficient for individualized rulemaking). New Jersey's APA, N.J.S.A. 52:14B-1 to -15 (1970 & Supp. 1981) as amended, L. 1981, c. 27, separates formal agency action into administrative adjudication and rulemaking.
Adjudicatory proceedings usually determine the legal rights and relations of specific individuals, see Bally Mfg. Corp., supra, 85 N.J. at 340; Shapiro, "Rulemaking or Adjudication," 78 Harv.L.Rev. at 924, 930, or a limited group of individuals. N.J.A.C. 1:1-6(a)(iii). These determinations often involve disputed factual issues, see Bally Mfg. Corp., supra, 85 N.J. at 340; Cunningham, supra, 69 N.J. at 23; N.J.A.C. 1:1-1.5(a)(3), and require evidence and cross-examination in an adversary proceeding for proper resolution. N.J.S.A. 52:14B-9(c), -10(a) (1970 & Supp. 1981).
Typically, adjudicatory hearings are what the APA calls "contested cases." N.J.S.A. 52:14B-2(b). But the terms are not coextensive. Contested cases are those in which the Constitution or a statute requires an adjudicatory hearing. Id. Adjudicatory hearings may be granted at the discretion of the agency in other circumstances. See In re Orange Savings Bank, 172 N.J. Super. 275, 283 (App.Div.), app. dism., 84 N.J. 433 (1980) (once Commissioner determines hearing is advisable, agency must conform to APA procedures for contested cases).
Generally, administrative rulemaking proceedings involve broader policy judgments. These proceedings seek to develop facts through investigation so that rules of prospective application may be developed. See Boller Beverages, Inc., supra, 38 N.J. at 151-152; Shapiro, "Rulemaking or Adjudication," 78 Harv.L.Rev. at 935. Although rules generally apply to a large class of individuals, rules that affect specific parties are nonetheless valid if enough other characteristics of rulemaking are present. See Bally Mfg. Corp., supra, *431 85 N.J. at 343; Cunningham, supra, 69 N.J. at 22; Shapiro, "Rulemaking or Adjudication," 78 Harv.L.Rev. at 924.
Administrative agencies possess the ability to be flexible and responsive to changing conditions. See Heir v. Degnan, 82 N.J. 109, 121 (1980). This flexibility includes the ability to select those procedures most appropriate to enable the agency to implement legislative policy. See N.J.S.A. 52:14F-7(a) (Supp. 1981). Therefore, agencies sometimes develop hybrid proceedings possessing characteristics of both adjudication and rulemaking. See Cunningham, supra, 69 N.J. at 21 (public utility ratemaking procedures, although quasi-legislative in origin, are conducted like quasi-judicial proceedings); N.J.A.C. 1:1-1.6(a)(3). In fact, courts and commentators have encouraged hybrid agency proceedings as a way of producing more reasoned agency decisions, especially in complex and controversial policy areas. See, e.g., International Harvester Co. v. Ruckelshaus, 478 F.2d 615, 649 (D.C. Cir.1973); id. at 651-652 (Bazelon, C.J., concurring); Bazelon, "Coping with Technology Through the Legal Process," 62 Cornell L.Rev. 817, 824-826 (1977); Stewart, "Vermont Yankee and the Evolution of Administrative Procedure," 91 Harv.L.Rev. 1805, 1812-1814 (1978). [Id. at 383-385].
Nevertheless, the agency is subject to the requirements of the Administrative Procedure Act (N.J.S.A. 52:14B-1 et seq.) when it acts in its rulemaking capacity. The effect of the circular letter in question was to enact a rule or amend one previously promulgated. The respondent's failure to comply with the requirements set by the Legislature governing promulgation of agency rules renders the circular letter void as defectively promulgated. N.J.S.A. 52:14B-4(d).
In addition, we are satisfied that the respondent is not authorized to share in child support collection incentive payments, including incentives attributable to the federal tax intercept funds, since the State has delegated to the county welfare agency the responsibility to enforce and collect said support obligations. Our conclusion is based upon a plain reading of the statutes, regulations and the legislative history thereof.
In this regard, 42 U.S.C.A. § 658(a) originally read:

When a political subdivision of a State makes for the State of which it is a political subdivision, or one State makes for another State, the enforcement and collection of the support rights assigned under Section 602(a)(26). ... There shall be paid to such political subdivision or such State from amounts which would otherwise represent the federal share of assistance to the family of the absent parent  (1) an amount equal to 25 percent of any amount collected.... [Emphasis supplied].
*432 Two important facts should be emphasized. First, in New Jersey the A.F.D.C. program is administered by the county welfare agencies, N.J.S.A. 44:10-2, subject to supervision by the Commissioner of Human Services. N.J.S.A. 44:10-3; Essex Cty. Welfare Div. v. Simon, 178 N.J. Super. 523, 527 (App.Div. 1981). Second, pursuant to regulations adopted by the commissioner, the county welfare agencies are solely responsible for the collection and enforcement of support rights. N.J.A.C. 10:81-1 et seq. Also, all rights to support are assigned to the county welfare agencies. N.J.A.C. 10:81, Appendix D, Section 201(b).
Thus, the above section as originally enacted provided that a state could only receive incentive payments in reciprocal support cases when it collected for another state. Aside from this exception, all incentives were paid to the political subdivisions of a state which enforced and collected child support. This is supported by the legislative history of that section which indicates a desire to increase support collections by making available a bonus to the local entity doing the collection and enforcement of support cases in state programs which utilize their localities as in New Jersey. The 1974 U.S.Code Cong. & Ad.News, p. 8154, states:
Since such a fiscal sharing in the results of support collections could be a strong incentive for encouraging the local units of government to improve their support enforcement activities, the bill would provide that if the actual collection ... is carried out by local authority, the local authority would receive a special bonus based on the amount of any child support payments collected which result in a recapture of amounts paid to the family as AFDC. [Emphasis supplied].
Thus, 42 U.S.C.A. § 658 as originally enacted did not authorize incentive payments to states who supervised the Title IV-D programs within its jurisdiction and also administered the same. As a result, that section was amended on June 17, 1980, by Pub.L. 96-272, § 307(a) and now provides:

When a political subdivision of a State makes, for the State of which it is a political subdivision, or one State makes, for another State, or a State on its own behalf makes, the enforcement and collection of the support rights assigned under section 602(a)(26) of this title (either within or outside of *433 such State), there shall be paid to such political subdivision, such other State, or such State (in the case of a State which on its own behalf makes such enforcement and collection) from amounts which would otherwise represent the Federal share of assistance to the family of the absent parent an amount equal to 12 percent of any amount collected and required to be distributed as provided in section 657 of this title to reduce or repay assistance payments. [Emphasis supplied].
The legislative history of this amendment provides:
Incentives for States To Collect Child Support Obligations.

Present law.  A 15 percent incentive payment financed entirely from the Federal share of collections is paid to States that enforce and collect support on behalf of other States, or to a political subdivision within a State that enforces or collects child support on behalf of its own State.

House bill.  No provision.
Senate bill.  The Senate bill retained provisions of present law, and, in addition, allowed States which enforce and collect child support within the State on their own behalf to receive the 15 percent incentive payment.

Conference agreement.  The House recedes.
[Emphasis supplied].
It is clear from a reading of the aforementioned section and the legislative history preceding its enactment, that a state may only retain the 15% incentive when it enforces and collects child support within its jurisdiction on its own behalf. This is not the case in New Jersey. Our Legislature has delegated collection and enforcement of support cases to the county welfare agencies. N.J.S.A. 44:10-2. The intricacies of the delegation were established by comprehensive regulations promulgated by the respondent. N.J.A.C. 10:81-1, et seq. Accordingly, since our Legislature delegated the support enforcement and collection responsibilities to the county welfare agencies, under federal statute they alone are entitled to the incentive payments.
Our holding is fully supported by the regulations promulgated by the federal Department of Health and Human Services. In this regard, 45 C.F.R. § 303.52 entitled, "Incentive payments to States and political subdivisions," provides in full:
(a) General provisions. (1) The State IV-D agency or, at its option, the political subdivisions of the State pursuant to the title IV-D State plan shall make incentive payments to:

*434 (i) Political subdivisions of the State that, under the approved title IV-D State plan, enforce and collect an assigned support obligation on behalf of the State; and
(ii) Other States or political subdivisions of other States that, under an approved title IV-D State plan, enforce and collect an assigned support obligation on behalf of the State.

(2) The State IV-D agency shall make incentive payments to itself when, under the approved title IV-D State plan, the State enforces and collects an assigned support obligation on its own behalf.

....
(c) Amount of incentives. A State or political subdivision that meets the requirements and conditions in this section is eligible to receive an incentive payment equal to 15 percent of any amount collected and required to be retained to reimburse assistance payments under § 302.51. For any one collection of assigned support, only one 15 percent incentive payment may be made.
(d) Payment of incentives. (1) Incentive payments must be paid from amounts which would otherwise be paid to the Federal Government to reimburse its share of assistance payments under § 302.51 of this chapter. [Emphasis supplied].
This regulation clearly indicates that incentive payments of 15% are to be paid to the state, or at its option, the political subdivision which according to the Title IV-D State plan, enforces and collects an assigned support obligation on behalf of the state, as in New Jersey. Likewise, 45 C.F.R. § 303.72(h) provides that the incentive payments on the amount of collections received by the state as a result of federal tax refunds shall also be distributed as required under 45 C.F.R. § 302.52. That section provides:
If the amount collected is in excess of the amounts required to be distributed under paragraphs (b)(1)-(3) of this section, any such excess shall be retained by the State as reimbursement for past assistance payments made to the family for which the State has not been reimbursed. The State may apply the amount retained to any sequence of months for which it has not yet been reimbursed. Of the amount retained by the State as reimbursement of past assistance payments, the IV-D agency shall determine the Federal Government's share of the amounts so retained so the IV-A agency may reimburse the Federal Government to the extent of its participation in the financing of the assistance payments. From the Federal government's share, the State IV-D agency or political subdivision of the State pursuant to the title IV-D State plan shall deduct and pay the incentive payment, if any, prescribed in § 303.52. If past assistance payments are greater than the total support obligation owed, *435 the maximum amount the State may retain as reimbursement for such assistance payments is the amount of such obligation, unless amounts are collected which represent the required support obligation for periods prior to the first month in which the family received assistance under the State's title IV-A plan, in which case such amounts may be retained by the State to reimburse the difference between such support obligation and such assistance payments. [Emphasis supplied].
We conclude that the respondent cannot retain any portion of incentives, including those attributable to federal tax refunds, heretofore paid to the county welfare agencies since the latter enforces and collects the support rights. The respondent is bound by the federal law and regulations.
Reversed.
NOTES
[1] Adopted August 13, 1981, Pub.L. 97-35, Title XXIII, § 2331(a), 95 Stat. 860, eff. October 1, 1981.
[2] The underlined portion which forms the subject of this controversy was added to this section on July 17, 1980 by Pub.L. 96-272, § 307(b).
[3] Pub.L. 97-248, § 174(c), 96 Stat. 403, adopted September 3, 1982, substituted "12 percent" for "15 percent" with respect to amounts collected on or after October 1, 1983.
[4] The statute then lists 12 specific purposes which are the object of the commissioner's rules, regulations and administrative orders.