WOODLAND PRIVATE STUDY GROUP, MINNESOTA MINING
AND MANUFACTURING COMPANY, AND ROHM AND HAAS
COMPANY, RESPONDENTS, v. STATE OF NEW JERSEY, DE-
PARTMENT OF ENVIRONMENTAL PROTECTION, AND ROB-
ERT E. HUGHEY, COMMISSIONER, OF THE DEPARTMENT
OF ENVIRONMENTAL PROTECTION, APPELLANTS.

Argued January 20, 1987—Decided November 16, 1987.

*Mary C. Jacobson,* Deputy Atty. Gen., argued the cause for appellants (*W. Cary Edwards,* Atty. Gen., *James J. Ciancia,* Asst. Atty. Gen., of counsel).

*William H. Hyatt, Jr.* argued the cause for respondents (*Pitney, Hardin, Kipp & Szuch,* attorneys; *Mr. Hyatt, Robert G. Rose,* and *William J. Friedman,* on brief).

The opinion of the Court was delivered by

CLIFFORD, Justice.

Plaintiffs, Minnesota Mining and Manufacturing Company and Rohm and Haas Company, known collectively as Woodland Private Study Group, challenge an Administrative Order, AO–69, issued by the Commissioner of the Department of Environmental Protection. Annexed to the order is a "policy statement" regarding "Participation of Responsible Parties in the Development of Remedial Investigations and Feasibility Studies." Plaintiffs are "Responsible Parties" within the meaning of that policy statement. They contend that AO–69 amounts to rulemaking and hence is subject to the procedural requirements of notice and hearing, whereas the Commissioner views his Order as no more than an intra-agency statement for which no such procedures are required.

The Appellate Division upheld plaintiffs' challenge to the Commissioner's Order. On the strength of *Metromedia, Inc. v. Director, Division of Taxation,* 97 *N.J.* 313 (1984), the court declared the order invalid, *Woodland Private Study Group v. State of New Jersey,* 209 *N.J.Super.* 261 (1986), inasmuch as it was "a rule subject to the procedural requirements for adoption

stated in the Administrative Procedure Act," *N.J.S.A.* 52:14B-1 to -15, *id.*, at 264 which requirements concededly had not been met by the agency. We granted certification on the State's petition, 104 *N.J.* 472 (1986), and now affirm.

## I

The underlying dispute between plaintiffs and the Department of Environmental Protection (DEP), well summarized in *Woodland Private Study Group v. State of New Jersey*, 616 *F.Supp.* 794, 796-98 (D.N.J.1985), has been brewing for some time. As the federal district court pointed out, during the 1950s and 1960s the Industrial Trucking Service Corporation allegedly deposited at two dump sites in Woodland Township, Burlington County, wastes generated by several manufacturing concerns, including these plaintiffs. *Id.* at 797. Sampling conducted by the DEP revealed the presence of volatile organics and pesticides at both sites and of ground water contamination at one of them. The hazardous nature of these sites made them priority targets of cleanup efforts by the DEP under the Spill Compensation and Control Act, *N.J.S.A.* 58:10-23.11 to -23.11z (Spill Act). *Ibid.*

On August 4, 1983, Industrial Trucking notified the DEP of possibly hazardous discharges at the Woodland sites. Following that notification, appellants and DEP entered into extensive negotiations over the scope of a Remedial Investigation/Feasibility Study (RI/FS) for the sites. *Ibid.* The RI/FS phase of the cleanup process involves the delineation and analysis of the pollution problems at a site, and makes recommendations for the implementation of various cleanup plans and technologies to remedy the hazardous conditions.

Plaintiffs sought primary responsibility for preparing the RI/FS, with the DEP to exercise an oversight role. *Ibid.* Initially, DEP appeared ready to accept such an arrangement. However, by letter dated February 17, 1984, DEP informed plaintiffs that a change in agency policy would bar them from

controlling the selection of a contractor to perform the RI/FS. DEP also announced that it would require plaintiffs to deposit into a trust fund the full cost of the DEP's proposed RI/FS for the Woodland sites, plus a twenty percent contingency fee. Plaintiffs refused to comply with DEP's request. *Ibid.*

On June 29, 1984, DEP issued AO–69. The Order forbids "responsible parties" (parties alleged to have contributed to or caused contamination at a site) from conducting an RI/FS. The Order further states in part:

In order to insure that a remedial investigation and feasibility study (RI/FS) of a site which is scheduled for a publicly funded RI/FS will be properly and reliably performed and to insure the maximum degree of public confidence in the results of the RI/FS, the * * * [DEP] will conduct all such RI/FS work.

AO–69 does permit private parties to "participate" in the development of an RI/FS under certain specified conditions. The private party must agree: (1) to the scope of work developed by the DEP; (2) that the State will hire the contractor to perform the RI/FS; (3) to pay in advance all the costs of the RI/FS, including the administrative costs of DEP; and (4) to comply with all applicable community relation requirements. Moreover, the agreement between DEP and the responsible party must be reduced to an administrative or judicial consent order.

Private party involvement under AO–69 is limited to minority membership on a committee chaired by a DEP representative. The committee is responsible for selecting the contractor to perform the work, approving the contractor's work plan, and overseeing the development of the RI/FS.

DEP concedes that AO–69 was not adopted in "substantial compliance" with the rulemaking prodedures of the Administrative Procedure Act (APA) as required by *N.J.S.A.* 52:14B–4(d). An "administrative rule" can be promulgated only on notice and in compliance with *N.J.S.A.* 52:14B–4. The APA, in *N.J.S.A.* 52:14B–2(e), defines an "administrative rule" as

each agency statement of general applicability and continuing effect that implements or interprets law or policy, or describes the organization, procedure, or practice requirements of any agency. The term includes the amendment or repeal of any rule, but does not include: (1) statements concerning the internal

management or discipline of any agency; (2) intra-agency and interagency statements; and (3) agency decisions and findings in contested cases.

Thus the latter three categories of administrative actions need not satisfy the notice and hearing requirements of *N.J.S.A.* 52:14B–4. Agency decisions in "contested cases," however, are subject to the notice and hearing requirements of *N.J.S.A.* 52:14B–9. Internal management, intra-agency, and interagency statements need not be preceded by notice and hearing.

The Appellate Division, faced with plaintiffs' challenge to AO–69 solely on the ground of procedural noncompliance with the requirements of the APA, concluded that the proper characterization of the order was controlled by this Court's recent opinion in *Metromedia, Inc. v. Director, Division of Taxation, supra,* 97 *N.J.* 313. There, the Court established six factors for determining that agency action constitutes an administrative rule, namely, when the determination

(1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. [*Id.* at 331–32.]

The Court emphasized that not all of these factors need be present in order for agency action to constitute a rule. Rather, the various factors can be balanced even if some are present and others are not. *Id.* at 332. The Appellate Division concluded that because AO–69 satisfied all six of the *Metromedia* factors, the Order was invalid for its failure to comply with the prescribed rulemaking procedures.

## II

As is by now apparent, the starting point for analysis of this appeal is our opinion in *Metromedia.* The threshold question is whether *Metromedia* controls the outcome here. We think not.

In *Metromedia* the Director of the Division of Taxation determined that Metromedia's corporate income tax would be calculated under the "audience share" method, a method never theretofore applied by the Director. *Metromedia* isolated a number of factors that "either singly or in combination, determine in a given case whether the essential agency action must be rendered through rulemaking or adjudication." 97 *N.J.* at 332. Appellants argue that this case does not implicate the rulemaking-adjudication distinction addressed in *Metromedia* because AO–69 falls within the intra-agency exception of *N.J. S.A.* 52:14B–2(e)(2).

*Metromedia* provides standards for determining whether rulemaking requirements apply to or govern an agency decision or particular agency action. *Metromedia* itself was concerned with whether an agency determination was subject to the criteria of either rulemaking or adjudication, 97 *N.J.* at 328, 332, 333, although the proceedings attendant to the Director's determination in that case were also held not to satisfy the "contested case" exception to rulemaking found in *N.J.S.A.* 52:14B–2(e)(3). *Id.* at 336. However, the application of the *Metromedia* criteria is not limited to the determination of whether a particular agency action is either rulemaking or adjudication. The criteria have been applied to determine whether other types of agency actions or determinations should be subject to rulemaking procedures.

In *In the Matter of the Request For Solid Waste Utility Customer Lists*, 106 *N.J.* 508 (1987), for example, the *Metromedia* criteria were applied to determine whether an agency order directing solid waste utilities to provide the agency with customer lists was a regulation. *Id.* at 517–18 (also concluding, *id.* at 521, that the absence of a factual dispute rendered adjudication inappropriate). In *Board of Education, City of Plainfield v. Cooperman*, 209 *N.J.Super.* 174 (App.Div.1986), aff'd, 105 *N.J.* 587 (1987), the Court applied the *Metromedia* criteria and held that the Commissioner of Education's "policy guidelines," which set forth the criteria that were to inform a local school

board's decision on whether to admit to school a child infected with AIDS, amounted to rulemaking under the *Metromedia* criteria. 209 *N.J.Super.* at 204–05. The *Metromedia* standard also provides the test of whether an agency directive or determination in the form of a statement constitutes rulemaking even if adjudication is not an appropriate or necessary alternative mode for agency decision.

*Cooperman* and *Customer Lists* thus applied the *Metromedia* criteria to distinguish rulemaking not from adjudication but from "informal action," which has been defined as agency action that is neither adjudication nor rulemaking. *Customer Lists, supra,* 106 *N.J.* at 519 (citing 1 K. Davis, *Administrative Law Treatise,* § 1.4 at 13 (2d ed. 1978)). The *Metromedia* criteria, although originally formulated in a context that distinguished rulemaking from adjudication, essentially provide a test of when rulemaking procedures are necessary in order to validate agency actions or determinations.

Informal action and adjudication, however, are not coincident with the intra-agency exception to rulemaking codified at *N.J.S. A.* 52:14B–2(e)(2). An intra-agency statement is not merely the absence of rulemaking or adjudication; it is rather a statement that because of its intra-agency status is accorded an exemption from the notice and hearing requirements. *Cf.* Diver, *The Optimal Precision of Administrative Rules,* 93 *Yale L.J.* 65, 76 (1983) ("Administrative rulemakers typically promulgate two kinds of rules: 'external' rules addressed principally to the regulated public, and 'internal' rules, addressed to persons charged with the enforcement of the external rules.").

*Metromedia*'s criteria, developed to distinguish rulemaking from adjudication, do not necessarily serve to define whether a given agency statement, decision, or determination satisfies the intra-agency exception. As noted in *Metromedia* not all of the criteria need be met in order for rulemaking procedures to be required. If none of those criteria applies or only a few apply, they must be balanced to determine whether rulemaking proce-

dures are to be invoked. Whether an agency statement or determination constitutes intra-agency action implicates other considerations not expressly addressed in *Metromedia*. The first *Metromedia* factor, for example, whether the statement is intended to have wide coverage rather than to affect an individual or select group, is uniquely suited to the rulemaking-adjudication distinction; but that factor arguably may not be determinative here, as procedural protections should not be denied just because an intra-agency statement affects only individuals and select groups (although the subject of AO–69 would embrace a regulated class). The second factor, general and uniform application, again is best directed to rulemaking-adjudication distinction rather than to the intra-agency exception. An interest is no less deserving of procedural protection prior to its deprivation because future parties might be subject to differing treatment. The same is true for *Metromedia's* third criterion, prospectivity.

■ These distinctions suggest that the nature and extent of the coverage or effect of an agency determination or action must also be weighed to determine whether rulemaking procedures are required. The effect or impact of agency conduct is relevant to the determination of the choice between rulemaking procedure and the intra-agency exception, which provides for no procedural protection at all. Even assuming that AO–69 satisfies all of the *Metromedia* criteria, the inquiry is not complete. The next question is whether AO–69 satisfies those criteria that distinguish a rule from an intra-agency statement.

The term "intra-agency statement" is nowhere defined in the APA. Moreover, no New Jersey case has attempted to provide a principled or abstract definition of the term. *See, e.g., Shapiro v. Albanese,* 194 *N.J.Super.* 418, 429 (App.Div.1984) (rejecting contention that a "Circular Letter" sent by agencies to counties was not an "intra-agency statement," without, however, defining that term.)

The term "intra-agency statement" is not self-defining. Although clearly a statement that is not transmitted within the agency cannot be considered an intra-agency statement, intra-agency transmission alone is not enough to constitute an intra-agency statement. The intra-agency exception cannot serve as a haven for agency actions that would otherwise require notice and hearing but for the fact that the statement was directed to another agency member.

Conversely, a statement originally directed within the agency does not lose its intra-agency status merely because the information contained in the statement will, when acted upon, have some impact on the regulated community. "[E]ven office hours necessarily require conformity on the part of the public." E. Freund, *Administrative Powers Over Persons and Property* 213 (1928). It is the nature of the statement's impact on affected parties that must be considered in determining whether notice and hearing are required.

The Federal Administrative Procedure Act exempts certain non-binding agency action, as distinguished from "legislative rules," from the requirements of notice and hearing. 5 *U.S.C.* § 553(b)(3)(A) (excepting "interpretative rules, general statements of policy, or rules of agency organization, procedure, or practice"). In determining whether a given agency action constituted a "rule of agency organization, practice, or procedure," the Court of Appeals for the District of Columbia, in *Batterton v. Marshall*, 648 *F.*2d 694 (1980), observed that the "problem with applying the exception is that many merely internal agency practices affect parties outside the agency—often in significant ways." *Id.* at 707. The objective, then, is to distinguish those internal statements that should remain immune from the notice and hearing requirements.

A useful articulation of the exemption's critical feature is that it covers agency actions that do not themselves alter the rights or interests of parties, although it may alter the manner in which the parties present themselves or their viewpoints to the agency. In this light, the exemption has applied to a freeze placed on the processing of applications for radio broadcast stations, to procedures accelerating the processing of applications for abandoning railroad lines

and those for processing discrimination charges, and to a directive specifying that requisite audits be performed by nonagency accountants.

The exemption cannot apply, however, where the agency action trenches on substantial private rights and interests. As the case law demonstrates, substantial rights and interests in this light have come into play when railroads are directed to file proposed schedules of rates and tariffs with subscribers; when applicants for food stamps are subject to modified approval procedures; when drug producers are subject to new specifications for the kinds of clinical investigations deemed necessary to establish the effectiveness of drug products prior to FDA approval; and when motor carriers are subject to a new method for paying shippers. [*Id.* at 707–08 (footnotes omitted).]

*See also Kessler v. F.C.C.*, 326 *F.*2d 673, 680 (D.C.Cir.1963) (quoting with approval FCC's view that rulemaking procedures need not be followed in fashioning rules "dealing with the method of operation utilized by Commission in the dispatch of its business"); *Pickus v. United States Bd. of Parole*, 507 *F.*2d 1107, 1113 (D.C.Cir.1974) (in determining whether exemption to rulemaking applies, test is whether the action "substantially affects the rights of persons subject to agency regulation"). "The central question is whether the agency action jeopardized the rights and interests of the parties." *Batterton, supra*, 648 *F.*2d at 708; *see also Commonwealth of Pennsylvania v. United States*, 361 *F.Supp.* 208 (M.D.Pa.1973) (applying "substantial impact" test and upholding rule that did not change the substantive law on discontinuance of service); *Standard Oil Co. v. Department of Energy*, 596 *F.*2d 1029, 1061 (Temp. Emer.Ct.App.1979) (applying "substantial impact" test and invalidating rule establishing method of costs-recovery under oil price regulations); *Chisholm v. F.C.C.*, 538 *F.*2d 349, 394 (D.C.Cir.) (Wright, J., dissenting) (collecting cases that have applied "substantial impact" test and arguing that FCC order exempting certain political debates from equal time rule should be invalidated for failure to comply with rulemaking procedures because of its substantial impact on candidates), *cert.* denied, 429 *U.S.* 890, 97 *S.Ct.* 247, 50 *L.Ed.*2d 173 (1976). *But see Rivers v. Becerra*, 714 *F.*2d 887, 890 (9th Cir.1983) (holding that "substantial impact" test should not determine whether notice and hearing are required, because section 553 explicitly except-

ed "interpretative rules [and] general statements of policy," an exception not included in our APA); Asimov, *Nonlegislative Rulemaking and Regulatory Reform,* 1985 *Duke L.J.* 381, 397 n. 79 (collecting federal cases that have chosen not to apply "substantial impact" test). The "substantial impact" test has received support from commentators as well. *E.g.,* Mayton, *The Legislative Resolution of the Rulemaking versus Adjudication Problem in Agency Lawmaking,* 1980 *Duke L.J.* 103, 122–29; Note, "A Functional Approach to the Applicability of Section 553 of the Administrative Procedure Act to Agency Statements of Policy," 43 *U.Chi.L.Rev.* 430, 443–46 (1976).

Other states have inserted a comparable limitation into the statutory exception for internal memoranda. In Connecticut, for example, statements "concerning only the internal management of an agency and not affecting private rights or procedures available to the public" are exempted from notice and hearing requirements. *Conn.Gen.Stat.* § 4–166(7); *see Persico v. Maher,* 191 *Conn.* 384, 402, 465 *A.*2d 308, 318 (1983) (exempting from notice and hearing requirements only those statements that do not have "substantial impact on the rights and obligations of parties who appear before the agency in the future"). Michigan, in adopting an intra-agency exception to rulemaking, has codified a similar limitation:

(g) An intergovernmental, interagency, or intraagency memorandum, directive or communication which does not affect the rights of, or procedures and practices available to, the public. [M.S.A. § 3.560(107).]

Some states have placed judicial limitations on the intra-agency exception to notice and hearing. New York's Constitution contains an exception for statements relating "to the organization or internal management" of an agency. *Const.* Art. IV, § 8. That provision has been construed to protect an agency order that had not "affected or imposed burdens upon the public generally." *Ingalls Iron Works v. Fehlhaber Corp.,* 29 *A.D.*2d 29, 32, 285 *N.Y.S.*2d 369, 372 (1967). Oregon's statutory exception for "internal management directives" was subjected to a similar judicial limitation in *Burke v. Children's Services Division,* 26 *Or.App.* 145,

552 *P*.2d 592 (1976), which interpreted that exception to cover only communications that "affect individuals solely in their capacities as members of the agency involved rather than as members of the general public who may have occasion to deal with the agency." 26 *Or.App.* at 151, 552 *P*.2d at 595; *see also* Frohnmayer, *The Oregon Administrative Procedure Act: An Essay on State Administrative Rulemaking Procedure Reform*, 58 *Or.L.Rev.* 411, 434–45 (1980) [hereinafter Rulemaking Reform] (suggesting that, among other limitations, the intra-management exception should apply only where the communication does not "affect or burden private or public interests").

The appropriate limitation on the intra-agency exception can be distilled from a comparison of the underlying purposes of the rulemaking procedural requirements and the intra-agency exception. The "essential purpose of * * * notice and comment opportunities is to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies." *Batterton, supra,* 648 *F*.2d at 703. The intra-agency exception is "designed to permit the executive branch to communicate with itself and with other units of government without delay or bureaucratic entanglement." *Rulemaking Reform, supra,* 58 *Or.L.Rev.* at 438–39; *see also* Asimov, *Nonlegislative Rulemaking and Regulatory Reform, supra,* 1985 *Duke L.J.* at 407–08 (agencies may choose not to act rather than devote their limited resources to notice and comment procedure). Intra-agency statements that affect interests beyond the agency implicate precisely the concerns articulated in *Batterton,* and notwithstanding the agency's interest in streamlined operation, procedural protections must not be ignored.

We hesitate to adopt the strict rule applied in *Burke v. Children's Services Division, supra,* which exempted from procedural requirements only those statements that have no impact on the regulated public. 26 *Or.App.* at 151, 552 *P*.2d at 595. Even the most narrowly drawn organizational internal

memo has, in a literal sense, some impact on the regulated public. A memo establishing office hours, as noted earlier, or an intra-agency directive ordering staff members not to accept paid lunches with the regulated public has some impact on the regulated public. Thus we conclude that the inquiry adopted by some states and federal courts is appropriate here: whether the agency action has a "substantial impact" on the rights or interests of the parties.

The "substantial impact" test alone may not be sufficient to isolate those internal agency statements that remain immune from the notice and hearing requirements. To take a prior example, an internal agency directive prohibiting agency members from accepting free lunches from the regulated public will have a "substantial impact" on those members of the public with an interest in buying lunch for a regulator. The basis for not requiring rulemaking procedure in that circumstance is not the absence of substantial impact, but rather the fact that the interest that is affected is not sufficiently important or worthy of recognition. *See Board of Educ. v. Cooperman, supra,* 105 *N.J.* at 599–600 (the process due is partly a function of the importance of the interest affected).

Where a legally countenanced *right* of a party is threatened by an internal communication of an agency, rulemaking procedure must be followed. What constitutes an *interest* that cannot be abridged without rulemaking procedure is not easily defined. The interest alleged must ultimately be legitimate, of justifiable concern. Many internal agency memoranda, for example, relate to prosecutorial discretion. Given limited resources, an agency must make important choices regarding which actions of the regulated public it should monitor or prosecute. In a real sense these communications can have a substantial impact on the regulated public: the memorandum may ultimately determine who is prosecuted, and knowledge of the communication might facilitate illegal conduct. The regulated public cannot be said to have a legitimate interest in frustrating the agency's enforcement mechanism, and thus

public hearing and notice need not precede issuance of the internal memorandum.

The inquiry is whether the agency's interest in streamlined procedure is outweighed by the importance of the interests that are affected. Generally where the interest implicated is legitimate, the balance will tilt in favor of notice and hearing for internal actions that have a substantial impact on that interest. In light of the foregoing we can define an intra-agency statement as (1) a communication between agency members that (2) does not have a substantial impact on (3) the rights or legitimate interests of the regulated public.

▮ Applying that standard to the facts of this case, we first observe that AO–69 was originally directed to agency members, although ultimately it was forwarded to the regulated public. The fact that the order or its contents were ultimately transmitted to the public does not necessarily negate the intra-agency status of a memorandum. Many strictly internal memoranda— for example, those establishing office hours or effecting organizational changes—require transmission to the public.

The next question is whether AO–69 has a substantial impact on the rights of the regulated public. In respect of responsible party participation in an RI/FS, the Spill Act states only that

[w]henever any hazardous substance is discharged, the department * * * may direct the discharger to remove, or arrange for the removal of, such discharge. [*N.J.S.A.* 58:10–23.11f(a).]

The Act, then, confers no right on the regulated public to participate in the cleanup procedures developed by DEP.

What cannot be ignored, however, is the vast economic interest implicated in the decisions attending the cleanup procedure. Under *N.J.S.A.* 58:10–23.11c any person who has discharged a hazardous substance is strictly liable for all cleanup and removal costs. Although DEP is empowered to remove or arrange for the removal of the hazardous substance, *N.J.S.A.* 58:10–23.-11f(a), any payment by the Spill Fund is ultimately recoverable from the discharger. *N.J.S.A.* 58:10–23.11q.

The parties that are ultimately liable for the cleanup have considerable incentive to proffer ideas and methods that might facilitate the cleanup procedure. With the important environmental and economic concerns at stake, the opportunity to participate in the cleanup procedures is far from a matter of indifference to the regulated public. The RI/FS phase of the cleanup procedure assesses the pollution problems at a given site and recommends cleanup plans to remedy the hazardous condition. Although AO–69 does not entirely eliminate participation of the regulated public, it imposes severe restrictions and conditions on that participation. AO–69 therefore restricts plaintiffs' participation in a proceeding that ultimately will determine plaintiffs' liability. Because AO–69 therefore has a substantial impact on a legitimate interest of the regulated public, it cannot be viewed as an intra-agency statement immune from rulemaking procedures.

The foregoing is not to suggest that DEP must or even should provide for participation of the regulated public in cleanup procedure. That decision remains within the sound discretion of DEP. The only constraint imposed today is that the agency must provide to the affected parties the opportunity for notice and comment in compliance with *N.J.S.A.* 52:14B–4 prior to determining the scope of the affected public's participation in the study.

Judgment affirmed.

O'HERN, J., dissenting.

This case presents a close call in defining the proper relationship between the judicial and executive branches of government. I believe that the better view is that the judiciary should not crystallize into a rule [1] the management practices of an

---

[1] At most, the issue here is one of due process, in the sense of procedural fairness. In *Callen v. Sherman's, Inc.*, 92 *N.J.* 114, 134 (1983), we emphasized:

executive agency, particularly in the rapidly evolving field of hazardous waste cleanup.

To place this issue in perspective, it helps to restate the role of administrative agencies in our governmental structure. With the growth of industrialized societies, modern legislatures were presented with complex issues regarding governmental regulation of private conduct. Legislatures increasingly entrusted to regulatory agencies the responsibility of developing the details of such programs. L. Jaffe, *Judicial Control of Administrative Action* 3 (1965).

Though resistant at first to the new forms, *Schechter Poultry Corp. v. United States*, 295 *U.S.* 495, 55 *S.Ct.* 837, 79 *L.Ed.* 1570 (1935), courts increasingly recognized and deferred to the agency's policymaking role: "[A]lthough the administrative process has had a different development and pursues somewhat different ways from those of courts, they are to be deemed collaborative instrumentalities of justice and the appropriate independence of each should be respected by the other." *United States v. Morgan*, 313 *U.S.* 409, 422, 61 *S.Ct.* 999, 1005, 85 *L.Ed.* 1429, 1435–36 (1941), *cited in* Bernard Schwartz, *Administrative Law* 20 (1976).

Once courts recognized that the choice of policy was for the agency, the next distinctive trend in the development of administrative law was to require procedural fairness before an agency could act as a lawmaker by formulating interstitial mandates that affected public conduct or by adjudicating private rights. Hence, the 1946 enactment of the Federal Administrative Procedure Act, 5 *U.S.C.* § 551 to 559.

Under our Constitution, administrative agencies are part of the executive branch of government. *N.J. Const. of 1947* art.

---

Fairness between the state and an individual finds expression through due process, a concept representing the minimal standards of reason and justice governing that relationship. That sense of fairness cannot be imprisoned in a crystal, but must be allowed to grow with the changing relationships of people to each other and to their government.

V, § 1, para. 11; *In re Kallen*, 92 *N.J.* 14, 20 (1983); *In re Uniform Admin. Procedure Rules*, 90 *N.J.* 85, 92–93 (1982). Administrative agencies implement the programs and policies that have been statutorily delegated to them by the Legislature. *See* 1 Davis, *Administrative Law Treatise* § 1:2 at 8–9 (2d ed. 1978). In exercising their responsibilities, "[a]dministrative agencies enjoy a great deal of flexibility in selecting the proceedings most suitable to achieving their regulatory aims." *Bally Mfg. Corp. v. New Jersey Casino Control Comm'n*, 85 *N.J.* 325, 338 (1981) (Handler, J., concurring). As we noted in *In re Uniform Admin. Procedure Rules, supra*, 90 *N.J.* at 104, even in the adoption of substantive mandates of conduct the choice of procedural mechanism is typically made by the agency head, who "can opt for either a rule making proceeding, an adjudication as a contested case *or some other flexible proceeding* which is appropriate to achieve the regulatory aims of the agency." *Id.* (emphasis added). Agency policy may be implemented and effectuated in a variety of ways: by regulations, internal guidance memoranda, executive orders, and interpretative rules or on a case-by-case basis. By no means is this an exhaustive list.

Moreover, we have consistently held that because the choice of procedure is one historically left to the discretion of the agency such administrative determinations should be given deference by the courts. *Department of Labor v. Titan Constr. Co.*, 102 *N.J.* 1, 18 (1985); *Texter v. Human Servs. Dep't.*, 88 *N.J.* 376, 385–86 (1982). In *Vermont Yankee Nuclear Power Corp. v. Natural Resources Defense Council*, 435 *U.S.* 519, 98 *S.Ct.* 1197, 55 *L.Ed.*2d 460 (1978), the United States Supreme Court cautioned reviewing courts against engrafting their own notions of proper procedure upon agencies entrusted by Congress with substantive functions. *Id.* at 524, 98 *S.Ct.* at 1202, 55 *L.Ed.*2d at 467. "[C]ourts are ill-equipped for 'social-cost accounting,' particularly when looking over an administrative policy maker's shoulder. Not only do courts lack the administrator's presumed investigative resources, analytic com-

petence, and technical literacy, but they view social policy issues through the refracting prism of judicial review." Diver, "The Optimal Precision of Administrative Rules," 93 *Yale L.J.* 65, 108 (1983) (footnote omitted) [hereinafter Diver]; *see also Oakwood at Madison, Inc. v. Township of Madison*, 72 *N.J.* 481, 633 (1977) (Clifford, J., concurring) ("judiciary has increasingly been solicited to become the problem-solver of our society").

Here we deal not so much with the agency's choice of procedures to mandate conduct by the regulated public as with the choice of procedures to guide conduct of the agency itself. The touchstone for decision is, of course, the New Jersey Administrative Procedure Act (APA), *N.J.S.A.* § 52:14B–1 to –15. In the Act, our Legislature balanced the need for procedural requirements of notice and hearing against the need for procedural flexibility in the administrative process by specifically excluding from the definition of "rule": "(1) statements concerning the internal management or discipline of any agency; (2) intraagency and interagency statements; and (3) agency decisions and findings in contested cases." *N.J.S.A.* § 52:14B–2(e).

As the majority opinion demonstrates, the words of the statute embracing matters of "internal management or discipline" and "intraagency statements" do not prevent courts from deciding what is a rule. Courts and commentators have given other content to the words of such statutes.[2] Some would distinguish between what are called primary and secondary rules. In this scenario, the administrative rule-maker is seen as promulgating two kinds of rules: " 'external' rules[,] addressed principally to the regulated public, and 'internal' rules, addressed to persons charged with the enforcement of external rules." Diver, *supra*, 93 *Yale L.J.* at 76. Another

---

[2]The language of the New Jersey Administrative Procedure Act is similar to the federal Administrative Procedure Act and to the Uniform Law rendition adopted by many states. Hence, it is useful to look to precedent elsewhere.

commentator has suggested that the way to separate these rules is to determine whether each is "merely a decision rule with a conduct side effect or instead an independent conduct rule." Dan–Cohen, "Decision Rules and Conduct Rules: On Acoustic Separation In Criminal Law," 97 *Harv.L.Rev.* 625, 632 (1984). The majority's example of an agency rule, that employees not accept lunch offers from the regulated public, would almost certainly meet many of the *Metromedia* standards.[3] A final test suggested is that of "definitiveness": whether the rule channels discretion definitively or tentatively. If the court finds that the discretionary power of the agency is definitively limited, the pronouncement is a legislative rule. The question, then, is whether a rule definitively or tentatively channels discretion. *See* Asimow, "Nonlegislative Rulemaking and Regulatory Reform," 1985 *Duke L.J.* 381, 391 [hereinafter Asimow].

Some courts have phrased the question, in part, in terms of whether the action "substantially affects the rights of those over whom the agency exercises authority." *Pickus v. United States Bd. of Parole,* 507 *F.*2d 1107, 1113 (D.C.Cir.1974); *see also Commonwealth of Pennsylvania v. United States,* 361 *F.Supp.* 208 (M.D.Pa.), *aff'd,* 414 *U.S.* 1017, 94 *S.Ct.* 440, 38 *L.Ed.*2d 310 (1973) (since law on discontinuance of carrier service has not been substantively changed, APA procedures are not required).

From this discussion, we may deduce that the labels of legislative and non-binding rules have " 'fuzzy perimeters' " and " 'establish no general formula.' " *Batterton v. Marshall,* 648 *F.*2d 694 (D.C.Cir.1980) (citations omitted). That court would view the issue in terms of "the underlying purposes of the procedural requirements at issue": does the judicial deci-

---

[3]The "no-free-lunch" rule is a statement of general policy; it has consequences beyond the agency itself; it is intended to apply uniformly to all similarly situated persons. *See Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313, 331–32 (1984).

sion advance the "essential purpose of * * * notice and comment opportunities [so as] to reintroduce public participation and fairness to affected parties after governmental authority has been delegated to unrepresentative agencies"? *Batterton, supra,* 648 *F.*2d at 703 (footnote omitted).

I do not see that this fundamental policy of representative government would be advanced in this case were we to require the agency to follow the rule-making process in deciding how it shall discharge its statutory obligations. As judges we are used to the adversary system. We like to hear from the other side. But what we see through Diver's "refracting prism of judicial review," we need not engraft upon an agency of government entrusted with cleaning up the residue of industrial society's waste products. I believe that the DEP's administrative order is best analogized, in concept but not in direction, to the federal EPA's similar guidance memorandum, which has been seen as conforming "to the pattern of internal management common in every federal agency." Anderson, "Negotiation and Informal Agency Action: The Case of Superfund," 1985 *Duke L.J.* 261, 313 n. 196 [hereinafter Anderson].

In this case, the DEP had to choose between assuming responsibilities for the removal job itself or letting the discharger clean up the waste site. The Spill Act has entrusted extraordinary discretion to the Department of Environmental Protection in this regard. *See Woodland Private Study Group v. State of New Jersey,* 616 *F.Supp.* 794 (D.N.J.1985). In implementing its environmental mandate, DEP has sought to safeguard the public's trust and confidence that the site would be properly cleaned up. AO-69's limitation on the extent to which an alleged discharger may conduct the first phase of the cleanup process—the remedial investigation and feasibility study (RI/FS)—seeks to guarantee public confidence that the site will be fully restored to environmental safety. DEP's control over the RI/FS process is critical in light of the temptation of parties responsible for the discharge to downplay the environmental conditions and the cost of site cleanup. Indeed,

the federal EPA incurred an enormous loss of public confidence when it invited dischargers to recommend how the pollution should be cleaned up. "Critics charged that the EPA had relaxed cleanup requirements as an inducement to private parties to clean up sites themselves, had agreed to cost-reimbursement settlements short of what [was recoverable under the law], had allowed politics to interfere with the proper administration of the Fund, and, in general, had failed to follow acceptable management practices." Anderson, *supra*, at 280 (footnotes omitted).

In this context there is not a little irony in federal EPA Administrator Ann Gorsuch Burford being held in contempt of Congress for failing to disclose the details of her negotiation of cleanup plans with alleged dischargers and in DEP Commissioner Robert Hughey being found to have violated the law by directing his staff that they alone should decide how best to clean up a hazardous waste site.

When courts overly "judicialize" the management of other agencies of government, they should not lose sight of the natural tendencies of the governed:

> Agency decisionmakers, like all rational beings, seek to function efficiently by maximizing utility—both their own and that of the regulatory program for which they are responsible. Given a fixed budget and many competing uses of available resources, efficient operation involves a constant weighing of the net marginal costs and benefits of a proposed course of action. Thus, in order to undertake a new legislative or nonlegislative rulemaking project, an agency must conclude that the net marginal benefits to the regulatory program or to the agency from adopting an incremental rule outweigh the net marginal bureaucratic costs of adopting it. [Asimow, *supra*, at 404 (footnote omitted).]

*See also* Smith, "Judicialization: The Twilight of Administrative Law," 1985 *Duke L.J.* 427 (administrative process has become so formalized that it has lost sight of original goal of effectuating governmental policy). Faced with these obstacles, the agency may simply decide to forget the whole thing. Asimow, *supra*, at 407–08.

In my view, AO-69 was essentially an internal policy choice of the Executive Branch. The pros and cons of the policy

choice had been fully aired. The DEP Commissioner knew that EPA had made the contrary choice. He took this site off the Superfund list because, after hearing the debate, he disagreed with the federal decision to allow dischargers to participate in the cleanup process. What policy goal of administrative law does increased formalism serve? Had the Governor or the Commissioner decided this to be the State's overarching policy and had the policy been effectuated through a speech at a cabinet or staff meeting, would we then rule that the policy could not be implemented in the absence of a written rule adopted after thirty days' notice? In my view, the administrative order primarily addressed the way that government governed itself. I would let the Executive Branch achieve that end through its choice of administrative actions.

Justice STEIN concurs in this opinion.

*For affirmance*—Chief Justice WILENTZ and Justices CLIFFORD, HANDLER, POLLOCK and GARIBALDI—5.

*For reversal*—Justices O'HERN and STEIN—2.