263 N.J. Super. 353 (1993)
622 A.2d 1335
ACADEMY BUS TOURS, INC., PLAINTIFF-APPELLANT,
v.
NEW JERSEY TRANSIT CORPORATION, A CORPORATION PUBLIC AND POLITIC OF THE STATE OF NEW JERSEY, AND NEW JERSEY TRANSIT BUS OPERATIONS, INC., DEFENDANTS-RESPONDENTS.
Superior Court of New Jersey, Appellate Division.
Argued February 23, 1993.
Decided March 31, 1993.
*355 Before Judges BILDER, BAIME and WALLACE.
Joseph J. Ferrara argued the cause for appellant (Ferrara & Hantman, attorneys; Mr. Ferrara, of counsel; Mr. Ferrara, Michael Eatroff and Raffi Momjian, on the brief).
E. Philip Isaac, Deputy Attorney General, argued the cause for respondents (Robert J. Del Tufo, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Mr. Isaac, on the brief).
The opinion of the court was delivered by BILDER, J.A.D.
This is an appeal by a private bus company from a final decision of the New Jersey Transit Board of Directors determining that an Atlantic City bus route should be operated by NJTransit and not contracted out.[1]

Background
By the Public Transportation Act of 1979, N.J.S.A. 27:25-1, et seq., New Jersey sought to provide a coherent public transportation system to serve the needs of its citizens. N.J.S.A. 27:25-2. As its chosen instrument for the creation of this system, the legislature established defendant New Jersey Transit Corporation. N.J.S.A. 27:25-4. Included in its mandate to provide a coherent public transportation system are both rail and bus service. N.J.S.A. 27:25-5 and 3e. It is authorized to operate *356 such service either directly or by contract with other public or private entities. N.J.S.A. 27:25-5h.
As part of its mandate to NJT, the legislature directed:
In the provision of public transportation services, it is desirable to encourage to the maximum extent feasible the participation of private enterprise and to avoid destructive competition. N.J.S.A. 27:25-2d.
And, as particularly relevant to the instant matter, provided for contracting out bus routes.
The corporation may enter into contracts with any public or private entity to operate motorbus regular route, paratransit or motorbus charter services or portions or functions thereof. Payments shall be by agreement upon such terms and conditions as the corporation shall deem necessary. N.J.S.A. 27:25-6b.
Although most of NJTransit's activities are subject to the usual public bidding requirements, contracts for the operation of routes are not. They have been specifically exempted. N.J.S.A. 27:25-11g(2)(d).

The Contracting-Out Program
In order to implement the legislature's desire that the participation of private enterprise be encouraged "to the maximum extent feasible", on April 29, 1986 the NJT Board adopted a contracting-out policy evidencing its intention to contract out approximately five percent of its existing service and to contract out new and restructured service. It interpreted the legislative mandate to mean that private carriers should be used when they can maintain quality service; improve the financial position of the state significantly on the route or routes in question; ensure continued responsiveness; and operate in a coordinated system and safely. It is the second of these goals which forms the background for Academy's dispute with NJT.
Included in the policy adopted by the NJT Board on April 29, 1986 were "CRITERIA FOR CONTRACTING OUT".
The contracting of service must be based on two important criteria. First, and foremost, the decision to contract regular route bus service must substantially improve the financial position of NJ TRANSIT for the service. Cost increases to other NJ TRANSIT services as a result of contracting shall be considered. *357 In this regard, the true measurement of cost savings must be predicated on actual cost reduction and not, as [the federal Urban Mass Transit Administration] proposes, the fully allocated cost of operations. To include cost which would not be eliminated (e.g. quality control, to management salaries, schedulers, etc.) distorts the actual benefit accrued through contracting service, and could in fact result in the worsening of the financial position of NJ TRANSIT.[2]
* * * * * * * *
1. The contracting of service must achieve, at a minimum, a substantial reduction over a five year period in cost for the service in question.
a. Cost per route shall be based on an avoidable direct cost basis.
b. When the contracting out of service results in a reduction of semi-fixed costs, those costs shall also be included as an "avoidable" cost.
c. Lost opportunities to use part-time labor on remaining routes shall be taken into account and considered an increased cost by NJ TRANSIT unless offset by projected growth.
d. Cost related to labor protection shall also be deducted from cost-savings which might be achieved through the contracting of service, unless the private carrier agrees to assume such cost.
e. Any additional cost which may be incurred, including monitoring and administrative costs associated with the contract shall be deducted from cost savings.
2. Garage facilities will be considered for closure should a sufficient number of routes be contracted out, unless such closure would preclude or substantially hamper NJ TRANSIT's ability to assume service should a private carrier under contract cease operation.
3. NJ TRANSIT will consider contracting of service when said contracting allows NJ TRANSIT to forego a capital cost to construct or expand a garage facility.
* * * * * * * *
Included in the policy's conclusions was the theorem:
Generally, a current NJ TRANSIT service or prospective service should be considered for external bid when:
 It improves the net financial position of NJ TRANSIT.
 It reinforces the six legislative mandates [found in the Act: efficiency; coordination; safety; responsiveness; participation by local governments, transit riders and concerned citizens encouraged; desirable to encourage participation of private carriers to the maximum extent feasible].
Included in the policy's concluding PROPOSED ACTIONS was:

*358 Establishment of a process to seek private carrier proposals for the operation of service when such a proposal improves the financial position of NJ TRANSIT by a substantial amount as it relates to the service to be bid.
Finally it should be noted that as part of that same policy, within the cost saving constraints, NJ TRANSIT was itself permitted to bid for service which was proposed for bidding out.
NJTBus may submit a bid for service, which shall not be less than NJTBus' avoidable cost for the service.

The Appeal

A.
This started as a Law Division Prerogative Writ action in which plaintiff Academy Bus Tours, a motorbus operator, inter alia, sought an order requiring defendants New Jersey Transit Corporation (NJTransit) and New Jersey Transit Bus Operation, Inc. (NJTBus) to award it a contract for the provision of shuttle service from the Atlantic City Railroad Terminal to all Atlantic City casinos (shuttle service) and to void a contract entered into for similar service by defendant NJTBus.[3] In support of its entitlement to this relief, Academy challenged the administrative procedures employed by the defendants in contracting out, particularly the use of avoidable costs, a practice which it alleged violates Sections 3(e) and 8(c) of the federal Urban Mass Transportation Act of 1964, 49 U.S.C.A. 1601 et seq.
On motion of the Attorney General, pursuant to R. 2:2-3(a)(2), the matter was transferred to us as an appeal from the final action of an administrative agency.
Although, in a narrow sense, plaintiff seeks a review of the failure to grant it the shuttle contract, from its brief on appeal it is clear that it is broadly challenging the practices and policies of NJTransit with regard to its contracting-out program. It not only raises issues with respect to the propriety of *359 using the avoidable costs in making the contracting-out determination, but raises a serious question of whether NJTransit has complied with our Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq.

B.
Sometime prior to June of 1990, NJTransit decided to provide shuttle service between the Atlantic City Rail Terminal and casinos. In accordance with its contracting-out policy, it solicited proposals for the provision of the service. Proposals were received from four private carriers (Academy, Sterling, Atlantic City Rail, and Shortline) as well as NJTBus. Although NJTBus submitted a bid of $3,302,402 compared with the $3,567,248 bid of Academy, the next lowest bidder, the NJTransit selection committee recommended award of the contract to Academy because that carrier's hourly costs were significantly lower and the committee had reservations about NJTBus' ability to utilize the part-time drivers required by the proposal and the allocation of mileage and overhead costs. Thereafter, perhaps in September, 1990, a staff recommendation was made and a proposed Board resolution authorizing the award of a 33 month shuttle service contract to Academy for $3,267,248[4] (plus five percent for contingencies) was prepared, its proposal having been negotiated downwards to bring its cost below that of NJTBus and thereby bring the proposed contract into compliance with the cost savings requirement of the contracting-out policy.
The proposed Academy contract was never entered into. On October 15, 1990, NJTransit rejected all the proposals[5] and *360 announced its intention to seek new proposals, which it did starting October 18, 1990. This time proposals were received from four private carriers (Academy, Sterling, Shortline, and County) as well as NJTBus. And this time the proposal from NJTBus gave the least cost.[6] On December 19, 1990, following a staff recommendation, the Board authorized a 30 month shuttle service contract with NJTBus for $2,487,224 (plus five percent for contingencies). On February 4, 1991, an agreement was made between NJTransit and NJTBus for the provision of the service. The agreement appears to employ the same form as is used for contracting-out services with private bus companies; NJTBus, a subsidiary of NJTransit and its chosen instrument for the operation of its bus routes, is described as "Carrier".[7]

C.
Academy has challenged the award of the route to NJTBus on a number of grounds.

Compliance with the Administrative Procedure Act
When NJTransit adopted its contracting-out policy on April 29, 1986, it did not comply with the procedural requirements of the Administrative Procedure Act, N.J.S.A. 52:14B-1 et seq. This is uncontroverted. Academy contends that the adoption of the contracting-out program and cost avoidance methodology was rule-making within the meaning of the APA *361 and that the failure to meet its requirements makes the policy void. NJTransit and NJTBus contend the contracting-out policy is no more than a statement concerning its internal agency management or intra-agency statement such as is expressly excluded from the requirements of the APA. N.J.S.A. 52:14B-2(e)(1) and (2). Although Academy broadly challenges the adoption of the entire policy, it particularly attacks the adoption of the avoidable cost methodology outside the procedural requirements of the APA.
Resolution of this issue requires a determination of whether the contracting-out policy is an "agency statement of general applicability and continuing effect that implements or interprets law or policy." N.J.S.A. 52:14B-2(e).
In Metromedia, Inc. v. Director, Div. of Taxation, 97 N.J. 313, 478 A.2d 742 (1984), we are instructed that:
[A]n agency determination must be considered an administrative rule when all or most of the relevant features of administrative rules are present and preponderate in favor of the rule-making process. Such a conclusion would be warranted if it appears that the agency determination, in many or most of the following circumstances, (1) is intended to have wide coverage encompassing a large segment of the regulated or general public, rather than an individual or a narrow select group; (2) is intended to be applied generally and uniformly to all similarly situated persons; (3) is designed to operate only in future cases, that is, prospectively; (4) prescribes a legal standard or directive that is not otherwise expressly provided by or clearly and obviously inferable from the enabling statutory authorization; (5) reflects an administrative policy that (i) was not previously expressed in any official and explicit agency determination, adjudication or rule, or (ii) constitutes a material and significant change from a clear, past agency position on the identical subject matter; and (6) reflects a decision on administrative regulatory policy in the nature of the interpretation of law or general policy. These relevant factors can, either singly or in combination, determine in a given case whether the essential agency action must be rendered through rule-making or adjudication. [Id. at 331-332, 478 A.2d 742].
Further help is given in the suggestion in Woodland Private Study Group v. State, 109 N.J. 62, 533 A.2d 387 (1987) that the first Metromedia factor's requirement of wide coverage might not apply where procedural protections ought to be applied to statements which affect select groups, id. at 69, 533 A.2d 387, and the definition of an exempted intra-agency statement.

*362 Generally when the interest implicated is legitimate, the balance will tilt in favor of notice and hearing for internal actions that have a substantial impact on that interest. In light of the foregoing we can define an intra-agency statement as (1) as communication between agency members that (2) does not have a substantial impact on (3) the rights or legitimate interests of the regulated public. [Id. at 75, 533 A.2d 387]
The lesson to be learned from these cases is that the question of whether a pronouncement by an agency is subject to the procedural requirements of the APA should not be dependent on semantics but must be decided upon an examination of the purpose and effect of the pronouncement and the ends sought by the APA.
Here NJTransit has adopted a policy which is intended to be applied generally and uniformly with respect to the prospective ability of outside carriers to bid on bus routes. It prescribes a standard, not expressly provided in the statute, for the participation of outside carriers in the operation of NJTransit bus routes. It reflects a decision with respect to a general policy of importance to the outside carriers and upon which they might well wish to make comment. As we said in Woodland below, 209 N.J. Super. 261, 265, 507 A.2d 300 (App.Div. 1986), "It establishes policy applicable to an industry." We conclude, therefore, that the contracting-out policy adopted by NJTransit on April 29, 1986 should have been adopted in accordance with the procedures of the APA and, having not been so adopted, is void. We do not envision that compliance with the APA will require hearings or invite proceedings of an adversary nature, but surely the affected carriers should have an opportunity to comment on the proposed policy. See Heir v. Degnan, 82 N.J. 109, 119, 411 A.2d 194 (1980).[8]
In concluding that the procedural requirements of the APA apply to the adoption of a contracting-out policy, it is important *363 to note that this conclusion does not apply to the adoption of the avoidable cost methodology, the matter to which Academy has given particular emphasis. The use of the avoidable cost methodology in the contracting-out policy is not a policy choice  it is a consequence. Once NJTransit makes a policy determination that the decision to contract-out must substantially improve its financial position for the service, the use of incremental or "avoidable cost" follows. This is the measure of whether the proposed contracting-out will save money. The full cost methodology for which Academy argues may be more accurate in reflecting the real cost of the service, but it will not show NJTransit what, if any, cost savings will accrue from the contracting-out of a particular route.
Because NJTransit has been operating its contracting-out policy for a number of years, apparently without challenge, and is currently using private carriers for the operation of a number of its bus routes in reliance on the lawful operation of that policy, the effect of our invalidation of NJTransit's contracting-out policy is stayed for six months in order to allow the agency to adopt its contracting-out policy in accordance with the requirements of the APA.
In view of the existence of these current contracts and because Academy's other contentions may well be relevant to the development of the appropriate regulations, we believe it prudent to comment on them.

The Agency's Failure to Comply with Its Own RFP Regulations and Rules
Although NJTransit has been statutorily exempted from the need to advertise or bid the contracting-out of bus routes and is free to negotiate such arrangements, N.J.S.A. 27:25-6b and 11g(2)(d), the contracting-out policy adopted by its Board provides for use of requests for proposal (RFP) to solicit operators and includes a provision that "All NJ TRANSIT RFP administrative procedures and rules will be followed." It also provides *364 for the use of an evaluation committee to provide recommendations with respect to a proposed contracting-out.
Academy contends that the award of the shuttle contract to NJTBus did not accord with its own regulations as contained in N.J.A.C. 16:72-3.1 et seq. and was therefore arbitrary and capricious. More particularly, it contends that NJTransit failed to follow its own RFP procedure with respect to the shuttle contract and failed to properly use an evaluation committee with respect to the final award.
Despite the provision that "RFP administrative procedures and rules will be followed," it is clear from a reading of the contracting-out policy as a whole and a consideration of its purposes and goals that these RFP procedures and rules are only to be employed to the extent that they are applicable. NJTransit has clearly interpreted its policy that way. That interpretation of its own policy is presumed reasonable, NJPDES Permit No. NJ 0055247, 216 N.J. Super. 1, 11, 522 A.2d 1002 (App.Div. 1987), certif. den., 108 N.J. 185, 527 A.2d 1390 (1987), and is entitled to substantial weight, see Simon v. Board of Trustees, 233 N.J. Super. 186, 195, 558 A.2d 490 (App.Div. 1989), certif. den., 117 N.J. 652, 569 A.2d 1348 (1989).
As we have already noted, the so-called bidding process in the contracting-out situation is a hybrid arrangement. Although treated as a bidder, NJTBus is really not bidding but is developing its avoidable costs[9]  the benchmark for the determination as to whether the service will be contracted out.[10] For convenience, NJTBus uses the RFP format; however, its response is not a bid but an advice as what its incremental costs would be for operating the route. For the outside carriers, the situation is quite different. They are bidding in a real sense against *365 each other, as well as bidding with the knowledge that unless the route can be operated for less than NJTBus avoidable cost, the route will not be contracted out.
NJTBus' right to bid is illusory and obfuscates the reality of its proposal. The notion that NJTBus can "bid" more than its avoidable costs is so inconsistent with the policy goal of contracting service to outside carriers that it is to be doubted that the policy can be recognized as permitting NJTBus to do more than develop an avoidable cost analysis. In order to fulfill the legislative direction to encourage the participation of private enterprise, the NJTransit Board determined that approximately five percent of its bus routes should be offered for operation by outside carriers. Implicit in the contracting-out policy which implements that decision is the principle that the selected route will be contracted out if a responsible proposal from an outside carrier meets the policy criteria  an important part of which is that it will furnish the service for less than NJTBus' avoidable costs; i.e., that it will substantially improve NJTransit's financial position. Moreover, if NJTBus were to truly bid, it would be required to develop two concepts  an avoidable cost analysis to establish the contract-out benchmark, and a competitive proposal. With respect to the latter, it might well be that, as Academy contends, the competitive proposal would have to be developed on the same basis as those offered by its competitors; i.e., it would have to play on a level field. Because we are satisfied that NJTransit's December 1990 action with respect to the shuttle route was in fact a recognition that there would be no cost saving in contracting out and a decision to operate the route itself through its NJTBus subsidiary, we need not consider this contention of Academy.
We are satisfied that NJTransit has violated neither the statutes, its regulations, nor its contracting-out policy in the procedures it employed with respect to the shuttle contract. Indeed, its practices fully conformed to the discretion afforded to it by the legislature in this area. See N.J.S.A. 27:25-6b and *366 11g(2)(d). NJTransit's action is entitled to be accorded the strongest presumption of reasonableness. See Newark v. Natural Resource Coun. Dept. Env. Prot., 82 N.J. 530, 539-540, 414 A.2d 1304 (1980), cert. den., 449 U.S. 983, 101 S.Ct. 400, 66 L.Ed.2d 245 (1990).

Unfettered Discretion and Compliance with Federal Mandates
Academy contends that the contracting program is being carried out as an uncontrolled discretionary program ungoverned by statute or rule  that NJTransit has failed to articulate the standards and principles that govern its decisions. See Matter of Vey, 124 N.J. 534, 543-544, 591 A.2d 1333 (1991). The claim is meritless. The Contracting-Out Policy adopted by NJTransit on April 29, 1986 gives all the guidance that is required for the proper exercise of its legislatively mandated discretion.
Academy also contends that the use of the avoidable cost methodology by NJTransit in its Contracting-Out Policy is not consistent with the requirement of the federal UMTA.
Academy misapprehends the question. It is not whether avoidable cost methodology is consistent with the privatization policies of UMTA but whether NJTransit's Contracting-out Policy is consistent with those federal policies. We believe they are. UMTA policy requires the development of a process for private enterprise participation. The NJTransit policy which Academy complains of does just that.
In attacking the policy, Academy relies on UMTA material which, to us at least, seems directed at competitive proposals. As we have already noted, NJTransit's policy does not place its bus subsidiary in a competitive situation. Moreover, the policy notice upon which Academy relies, Private Enterprise Participation in the Urban Mass Transportation Program, 49 Federal Register 4310 (1984), specifically disclaims an intention to dictate *367 or to disqualify grantees who do not fully comply with its policy.
The policy [regarding private enterprise participation in the development of plans and programs to be funded under the Mass Transportation Act of 1964, as amended] provides interim guidance to grantees and private sector providers on specified private enterprise provisions of the UMT Act. It is [the Urban Mass Transportation Administration's] intention to promulgate a regulation to implement these provisions in the near future.[11]
* * * * * * * *
UMTA does not intend to dictate specific ways to address the factors set forth in this policy statement. Similarly, failure to address any one of these elements may not necessarily undermine the validity of a grantee's planning process or disqualify grantees from receiving Federal assistance. [The UMTA goes on to say that these factors will be considered in evaluation of an applicant's efforts to maximize private enterprise participation.]
In any event, we would deem it inappropriate to pass on the contracting-out policy's compliance with the federal Urban Mass Transportation Act requirements in advance of appropriate consideration by the Urban Mass Transit Administration, the agency charged with its administration. Entanglements in disagreements as to the meaning of the federal administrative policy in advance of consideration by the UMTA would be premature and, indeed, might interfere with its ability to properly carry out its legislated mandates.

Conclusion
NJTransit's Contracting-out policy is declared void for failure of the agency to adopt it in accordance with the APA. The operation of this determination is stayed for six months to give the agency an opportunity to properly adopt a policy in accordance with the APA.
NOTES
[1] Academy also appealed from a similar decision with respect to a Meadowlands Park and Ride route in northern New Jersey. This decision has since been reversed and the service contracted out to Academy. This aspect of the appeal is therefore moot.
[2] The other criteria, efficiency of service and quality of service, are not the focus of the parties' controversy.
[3] Because, as noted, the Meadowlands route has now been contracted out to Academy, references in the complaint to that route have been omitted.
[4] Apparently NJTransit was able to negotiate the contract down $300,000 from the amount contained in the proposal. This made the final sum less than NJTBus' bid, presumably the incremental cost of the service to NJTransit, and brought the proposed contract into conformance with the cost-savings requirement of the contracting-out policy.
[5] According to the affidavit of Albert Hasbrouck, Assistant Executive Director for Corporate Affairs of NJ Transit, this action was taken to give the other companies an equal opportunity to reduce the amount of their original proposals.
[6] On November 5, 1990, NJTBus operator's union agreed to permit the use of part-time operators for up to 50% of the total hours for shuttle service. As a result, NJTBus arrived at a cost of $2,487,224 for the service, $614,998 below the next highest bid (submitted by Academy).
[7] At oral argument, there was general agreement that NJTBus is an alter ego of NJTransit  merely the vehicle by which it carries on its bus functions.
[8] To the extent that Academy may be claiming a right to an administrative hearing with respect to the award of a particular contract, it is sufficient to note that even under the bidding laws no such hearing is required. See Commercial Clean. Corp. v. Sullivan, 47 N.J. 539, 552-553, 222 A.2d 4 (1966).
[9] At oral argument, both parties agreed that NJTBus is not a bidder.
[10] "First, and foremost, the decision to contract regular route bus service must substantially improve the financial position of NJ TRANSIT for the service." NJTRANSIT CRITERIA FOR CONTRACTING OUT.
[11] It appears no such regulation has been promulgated.