POLLUTION CONTROL FINANCING AUTHORITY OF WARREN COUNTY, NEW JERSEY, PLAINTIFF-APPELLANT, AND COUNTY OF HUNTERDON AND HUNTERDON COUNTY UTILITIES AUTHORITY, INTERVENORS-APPELLANTS, v. THE NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION, DR. RICHARD T. DEWLING, COMMISSIONER, AND GERALD BURKE, DIRECTOR, OFFICE OF REGULATORY SERVICES, DEFENDANTS-RESPONDENTS.

Superior Court of New Jersey
Appellate Division

Argued November 1, 1989—Decided December 5, 1989.

Before Judges KING, SHEBELL and BAIME.

*Robert A. Maren* argued the cause for appellant (*Broscious, Cooke & Glynn,* attorneys; *Robert A. Maren* on the brief).

*John P. Gallina* argued the cause for intervenors-appellants (*Gaetano M. DeSapio,* attorney; *John P. Gallina* on the brief).

*Paul H. Schneider,* Deputy Attorney General, argued the cause for respondents (*Peter N. Perretti, Jr.,* Attorney General, attorney; *James J. Ciancia,* Assistant Attorney General, of counsel; *Paul H. Schneider* on the brief).

The opinion of the court was delivered by

BAIME, J.A.D.

This appeal presents a question of first impression. *N.J.S.A.* 13:1E–138 imposes three new taxes on the disposal of solid waste at sanitary landfills. Exempt from taxation are the "waste products resulting from the operation of a resource recovery facility." *N.J.S.A.* 13:1E–138 a, b and c. Although there are various types of resource recovery facilities, *see N.J.S.A.* 13:1E–137v, we are concerned here with an incinerator that reduces solid waste to ash residue by combustion, thereby producing energy. At issue is whether solid waste materials, other than those resulting from the combustion process, fall within the statutory exemption. We hold that only those materials which are subjected to and produced by the actual incineration process are exempt from the new taxes. Stated generally, solid wastes which bypass a resource recovery facility and are not treated do not constitute "waste products resulting from the operation of a resource recovery facility" and are thus not exempt.

I

The facts are not in dispute and are largely a matter of public record. The Pollution Control Financing Authority of Warren County (PCFA), a body corporate and politic created under the New Jersey Pollution Control Financing Law, *N.J.S.A.* 40:37C–1 to 40:37C–18, was instrumental in constructing New Jersey's first resource recovery facility. The facility will receive and incinerate acceptable, combustible, non-hazardous municipal waste for energy production. In addition, a sanitary landfill is presently under construction in Warren County. When completed, this landfill will receive the ash residue produced by the combustion of solid waste at the resource recovery facility. The landfill will also receive other materials which are not incinerated at the facility because they are bypassed or are unsuitable for burning. These facilities will serve Warren

County and, pursuant to an inter-district agreement, will also accept some wastes from Hunterdon County.

By letter dated May 5, 1987, counsel for the PCFA asked the New Jersey Department of Environmental Protection (NJDEP) for a determination concerning the applicability of the new taxes to Warren County's sanitary landfill. In the letter, counsel noted that there are situations in which solid wastes will not be accepted for incineration at the resource recovery facility, but instead will be disposed of at the landfill. Several categories of waste fall within this classification. First, it is anticipated that waste will be generated in excess of the capacity of the resource recovery facility and these materials will not be subject to the combustion process. Similarly, there will be periods in which the incinerator is not operational due to repairs or maintenance and, in this event, wastes will be disposed of at the landfill. Further, certain "non-processible" wastes not suitable for burning will be bypassed and will be directed to the landfill. The PCFA asserted that such wastes, those not produced by incineration, as well as the ash residue resulting from the combustion process, should not be subject to taxation.

On July 15, 1987 the NJDEP responded by letter. The NJDEP determined that only wastes produced by the incineration process, ash residue, fall within the purview of the exemption provided by *N.J.S.A.* 13:1E–138 a, b and c. Those materials which bypass the incinerator, either (1) because they exceed the facility's capacity, (2) are received when the facility is not operational or (3) are of a kind which, by their nature, are not subject to the combustion process, were declared subject to taxation.

Following its receipt of the NJDEP's opinion letter, the PCFA filed a complaint in the Superior Court, Law Division, seeking a declaratory judgment. Thereafter, Hunterdon County and the Hunterdon County Utilities Authority (Hunterdon) were permitted to intervene. The case was then transferred to the Appellate Division. *R.* 1:13–4.

The PCFA seeks a reversal of the NJDEP's determination on the basis that (1) only the Director of the Division of Taxation had jurisdiction to resolve questions relating to the applicability of the statutory exemption, (2) the NJDEP's action constituted *de facto* rule-making in violation of the Administrative Procedure Act (*N.J.S.A.* 52:14B–1 to 52:14B–15), and (3) under the statute, all materials and wastes received by a sanitary landfill from a resource recovery facility are excepted from the three taxes. Hunterdon joins in the PCFA's substantive argument that the exemption applies to wastes bypassed from the incineration process as well as ash residue.

## II

Before considering the arguments advanced, a brief description of the operative statutory scheme is necessary for a full understanding of the issues presented. The legislation creating the new taxes supplements the Solid Waste Management Act (*N.J.S.A.* 13:1E–1 to 13:1E–198). In its findings, the Legislature acknowledged that "New Jersey must move away from its current reliance on landfilling as the principal method of solid waste disposal" and adopt new and efficient "waste reduction, recycling and energy recovery technologies." *N.J.S.A.* 13:1E–136. "Decreasing the waste flow to landfills, whether by means of predisposal methods such as source separation and recycling or through high technology conversion" was thus said to be "in the energy, environmental, and economic interests" of the State. *Ibid.*

In furtherance of this objective, and in keeping with similar efforts in other states, the Legislature developed a "two-pronged" strategy for managing solid waste disposal designed to encourage a transition from a traditional and virtually exclusive reliance on landfilling to the increased use of advanced resource recovery incinerators and facilities. *Statement of the Senate Energy and Environmental Committee, Assembly No.* 1778–*L.* 1985, *c.* 38. "The first component of ... the

strategy consists of the imposition of taxes on solid wastes disposed of at landfills, designed to provide counties with funds with which to make the transition toward resource recovery," and to establish "incentives" for that purpose. *Ibid.* The second component "establishes a procurement procedure" for the provision of resource recovery services.

Pursuant to *N.J.S.A.* 13:1E–138 a, b and c, "[t]here is levied upon the owner or operator of every sanitary landfill facility" three taxes, a solid waste services tax, a resource recovery investment tax and a solid waste importation tax. Together, these are commonly known as the McEnroe taxes. As we mentioned at the outset of our opinion, a common exemption excepts from all three taxes the "acceptance for disposal of the waste products resulting from the operation of a resource recovery facility." *Ibid.*

The statutes "establish several funds as depositories of the revenues generated from the three new landfill taxes." *Ibid.; see also N.J.S.A.* 13:1E–147; *N.J.S.A.* 13:1E–149. The "Solid Waste Services Tax Fund" is thus established in the NJDEP. *N.J.S.A.* 13:1E–147. The counties "can use ... moneys [from this fund] for district solid waste management plan implementation, public participation programs, and the implementation of the goals of the State Recycling Plan." *Statement of the Senate Energy and Environmental Committee, supra.* The "Resource Recovery Investment Tax Fund" is created in the Department of the Treasury, *N.J.S.A.* 13:1E–149, and is designed to "subsidize the cost differential between current landfill disposal costs and anticipated resource recovery tipping fees," to "finance the design, construction, operation, and maintenance of new or expanded sanitary landfill facilities to be used for the disposal of ash residue ... and to finance the closure costs associated with terminated landfills...." *Statement of the Senate Energy and Environmental Committee, supra.*

To recapitulate, "the days of the dominance of landfills are numbered." *Ibid.* In creating the McEnroe taxes, the Legislature intended to encourage the transition from landfills to resource recovery facilities and to promote corresponding efforts toward recycling and waste reduction.

We now turn to the arguments advanced by the PCFA and Hunterdon. We consider these contentions in the order raised.

### III

We first address the PCFA's argument that the NJDEP lacked jurisdiction to determine whether the statutory exemption was applicable to bypassed wastes not produced by the combustion process. We find no merit whatsoever in this contention.

At the outset, we observe that it was the PCFA that requested the NJDEP to render a written determination concerning the applicability of the taxes to the wastes which will bypass its resource recovery facility. In furtherance of its application, the PCFA emphasized the "importan[ce]" of having an immediate and authoritative resolution of the issue by the NJDEP. Having beseeched the NJDEP to decide the question, and now unhappy with the outcome, the PCFA is in a poor position to condemn the very procedure it sought and urged.

Beyond this, we find that the NJDEP had the authority to respond to the PCFA's request. We have reviewed the statutory scheme in some detail earlier in our opinion. Suffice it to say, the NJDEP, the Department of the Treasury, including the Director of the Division of Taxation, the Department of Community Affairs, the Department of Public Advocate and the Board of Public Utilities all share responsibilities under these taxation statutes. *See, e.g., N.J.S.A.* 13:1E–137d, h, i, j; *N.J.S.A.* 13:1E–145; *N.J.S.A.* 13:1E–146b. While the Director of the Division of Taxation is responsible for preparing the requisite forms and collecting the taxes, *N.J.S.A.* 13:1E–139, 13:1E–140 and 13:1E–141, and has incidental authority necessary to

fulfill his duties, *N.J.S.A.* 13:1E–142, the other agencies also possess substantial power to execute their respective responsibilities.

We stress that the NJDEP plays a key role in the administrative scheme established to implement the McEnroe taxes. For example, the statute confers substantial authority on the NJDEP in determining periodic adjustments of the rate of taxation. *N.J.S.A.* 13:1E–146a. Moreover, revenues derived from the solid waste services tax are to be earmarked and placed in a "non-lapsing revolving fund" in the NJDEP. *N.J. S.A.* 13:1E–147. The NJDEP is empowered to administer the fund and insure that appropriate disbursements are made. *Ibid.; N.J.S.A.* 13:1E–148.

While revenues derived from the resource recovery investment tax and the solid waste importation tax are to be paid into a fund established in the Department of Treasury, *N.J.S.A.* 13:1E–149, to be administered by the governing body of each county, *N.J.S.A.* 13:1E–150, the NJDEP nonetheless plays a central part in determining the manner in which such moneys are expended. For example, funds may be disbursed only in accordance with a "plan [that] shall be adopted as an amendment to the district's solid waste management plan," *N.J.S.A.* 13:1E–150c, which must be approved by the NJDEP. *N.J.S.A.* 13:1E–24. Further, the NJDEP may assume direct management of the fund when it determines that the county has failed to fulfill its planning responsibilities. *N.J.S.A.* 13:1E–151, 13:1E–152.

Against this statutory and regulatory backdrop, we are convinced that the NJDEP had the power incidental to its administrative responsibilities to respond to the PCFA's inquiry. *See New Jersey Guild of Hearing Aid Dispensers v. Long*, 75 *N.J.* 544, 562 (1978); *In re Suspension of Heller*, 73 *N.J.* 292, 303 (1977); *In re Regulation F–22, Office of Milk Industry, New Jersey*, 32 *N.J.* 258, 261 (1960). In any event, we have been advised by letter that the Director of the Division of Taxation

concurs in the NJDEP's analysis and opinion. We are, thus, entirely satisfied that the NJDEP acted properly in responding to the PCFA's inquiry and that the determination appealed from constituted a final agency action reviewable by this court. *See R.* 2:2–3(a)(2); *see also Gormley v. Lan,* 181 *N.J.Super.* 7 (App.Div.1981), aff'd 88 *N.J.* 26 (1981).

## IV

We next turn to the PCFA's argument that the NJDEP's determination constituted a *de facto* rule in violation of the Administrative Procedure Act. We treat this contention summarily because we are convinced that it clearly lacks merit. *R.* 2:11–3(e)(1)(E).

What constitutes an administrative rule under *N.J.S.A.* 52:14B–2(e) has been exhaustively explored by our Supreme Court in *Metromedia, Inc. v. Director, Div. of Taxation,* 97 *N.J.* 313 (1984). *See also Crema v. New Jersey Dept. of Environmental Protection,* 94 *N.J.* 286 (1983); *Texter v. Human Services Dep't,* 88 *N.J.* 376 (1982); *Bally Mfg. v. New Jersey Casino Control Com'n,* 85 *N.J.* 325 (1981), app. dism. 454 *U.S.* 804, 102 *S.Ct.* 77, 70 *L.Ed.*2d 74 (1981); *Boller Beverages, Inc. v. Davis,* 38 *N.J.* 138 (1962). *Metromedia* provides standards for determining whether rulemaking requirements apply to or govern an agency decision or particular agency action. The precise issue presented in *Metromedia* concerned whether an agency determination was subject to the criteria of either rulemaking or adjudication. 97 *N.J.* at 328, 332–333. In several more recent opinions, however, the Court has made it clear that *Metromedia* is not limited to the determination of whether a particular agency action is either rulemaking or adjudication. *See Woodland Private Study Group v. State,* 109 *N.J.* 62, 67 (1987); *In the Matter of the Request for Solid Waste Utility Customer Lists,* 106 *N.J.* 508, 517–518 (1987). *See also American Cyanamid v. Dept. of Environ. Prot.,* 231 *N.J.Super.* 292, 304–305 (App.Div.1989), certif. den.

117 *N.J.* 89 (1989); *Radiological Society v. N.J. Dept. of Health,* 208 *N.J.Super.* 548, 558–560 (App.Div.1986), certif. den. 104 *N.J.* 444 (1986). These decisions have applied the *Metromedia* criteria to distinguish rulemaking not from adjudication, but from "informal action," "intra-agency statements," and "policy statements." Thus, the *Metromedia* standards, "although originally formulated in a context that distinguished rulemaking from adjudication, essentially provide a test of when rulemaking procedures are necessary in order to validate agency actions or determinations." *Woodland Private Study Group v. State, supra,* 109 *N.J.* at 68.

Applying the *Metromedia* guidelines here, we find that the NJDEP's determination is merely declarative of that which is "obviously inferable from the specific language" of the statute. 97 *N.J.* at 329. Stated simply, the NJDEP's determination rests on a clearly articulated statutory standard. There was thus no need adopt a regulation or otherwise to comply with the requirements of the Administrative Procedure Act.

## V

Finally, we are in complete accord with the NJDEP's interpretation of the statutory language. We note that exemptions from taxation "are to be construed narrowly." *Fedders Financial Corp. v. Taxation Div. Dir.,* 96 *N.J.* 376, 386 (1984); *see also Fairlawn Shopper, Inc. v. Director, Div. of Tax.,* 98 *N.J.* 64, 73 (1984); *Walter Reade, Inc. v. Dennis Tp.,* 36 *N.J.* 435, 440 (1962). When a taxpayer seeks an exemption, "the probable legislative intent is one of inclusion...." *Fedders Financial Corp. v. Taxation Div. Dir., supra,* 96 *N.J.* at 386. Exemptions "will not be extended beyond the ascertainable intention of the Legislature." *Walter Reade, Inc. v. Dennis Tp., supra,* 36 *N.J.* at 440.

Here, the statutory language is absolutely clear. By its very terms, the exemption was intended to apply only to "waste products resulting from the operation of a resource recovery

facility." *N.J.S.A.* 13:1E–138a, b and c. Here, such wastes are those which are the "product" of the combustion process, *i.e.*, the ash residue remaining after incineration. Clearly not included are solid wastes which bypass the resource recovery facility.

Our interpretation comports with the plainly expressed statutory design and is consonant with the public policy considerations that undergird the taxation scheme. As we noted previously, the legislative purpose was to encourage transition from landfills to resource recovery facilities. By exempting from taxation waste products resulting from the operation of a resource recovery facility, the Legislature clearly intended to provide a financial incentive for this transition. The goal was to promote the expansion of the capacity of resource recovery facilities and to advance predisposal methods such as "source separation and recycling." *N.J.S.A.* 13:1E–136. The interpretation urged by the PCFA and Hunterdon would exempt from taxation materials that could feasibly be recycled. Moreover, their construction of the statutory scheme is alien to the legislative goal of providing financial incentives to promote expansion of the capacity of resource recovery facilities. We reject their interpretation. Instead, we hold that only those wastes that are subjected to and are produced by the combustion process fall within the purview of the exemption.[1]

We note the limited contours of our opinion. As pointed out in the dissent, there are various types of resource recovery facilities. These include incinerators, mechanical composting devices and other technologies designed to break down solid waste and produce energy. *See N.J.S.A.* 13:1E–137v. In this

---

[1]Stripped to its essentials, the argument advanced by the PCFA and Hunterdon, and apparently adopted by the dissent, is that once a district has constructed a resource recovery facility all solid wastes delivered to a sanitary landfill are exempt from the new taxes. Such an interpretation, if adopted, would subvert the legislative plan and would be repugnant to the statutory language employed.

case, the technology employed is an incinerator that reduces waste to ash residue by combustion and produces energy. We find that solid wastes which bypass this process and are neither treated nor produced by incineration do not constitute "waste products resulting from the operation of a resource recovery facility." We have no occasion to determine what waste products result from the operation of other types of resource recovery facilities and are thus exempted from taxation. In the context of the facts here, we hold that solid wastes which bypass the resource recovery facility are not exempt from the McEnroe taxes.

The determination of the NJDEP is affirmed in all respects.

SHEBELL, J.A.D., dissenting.

I dissent from that portion of the opinion of the majority which affirms the determination of the NJDEP that only waste produced by the incineration process, *i.e.*, ash residue, falls within the purview of the exemptions provided by *N.J.S.A.* 13:1E–138 a, b and c. The exemption portion of those tax provisions explicitly provides that none of the three taxes in question "shall be levied on the owner or operator of a sanitary landfill facility for the acceptance for disposal of the waste products resulting from the *operation of a resource recovery facility*." (Emphasis supplied). The plural, "waste products," was used by the Legislature, which specifically included waste products from the *"operation* of a *resource recovery facility."* (Emphasis supplied).

While the statute does not contain a definition of waste products, it does clearly define "resource recovery facility" stating the term "means a solid waste facility constructed and operated for the incineration of solid waste for energy production and recovery of metals and other materials for reuse; *or* a mechanized composting facility, *or* any other solid waste facility constructed or operated for the collection, separation, recycling, and recovery of metals, glass, paper, and other materials

for reuse or for energy production[.]" *N.J.S.A.* 13:1E–137v (emphasis supplied). If the Legislature had meant to only exempt incineration ash, it surely would have so stated. Further, under the Legislature's definition of "resource recovery facility," an incinerator need not even be part of the operation.

As noted by the majority, the purpose of the tax is " 'designed to provide counties with funds with which to make the transition toward resource recovery,' " and to establish " 'incentives' for that purpose." Majority opinion at 167–168. Warren and Hunterdon Counties have apparently done what the Legislature wanted, and its citizens should not be saddled with taxes which the Legislature specifically intended to exempt them from by reason of their having made the transition.

I would reverse the decision of the NJDEP and exempt all waste products resulting from the operation of Hunterdon County's resource recovery facility exactly as the Legislature provided.