266 N.J. Super. 429 (1993)
630 A.2d 280
FOSTER WHEELER PASSAIC, INC., PLAINTIFF-RESPONDENT,
v.
COUNTY OF PASSAIC, PASSAIC COUNTY UTILITIES AUTHORITY, AND NEW JERSEY DEPARTMENT OF ENVIRONMENTAL PROTECTION AND ENERGY, DEFENDANTS-APPELLANTS.
Superior Court of New Jersey, Appellate Division.
Argued June 14, 1993.
Decided July 14, 1993.
*431 Before Judges SHEBELL, A.M. STEIN and CONLEY.
Sheldon L. Cohen argued the cause for appellants County of Passaic and the Passaic County Utilities Authority (DeCotiis & Pinto, attorneys; Mr. Cohen, of counsel; Michael S. Caro, on the brief).
Carla Vivian Bello, Senior Deputy Attorney General, argued the cause for appellant Department of Environmental Protection and Energy (Robert J. Del Tufo, Attorney General, attorney; Andrea M. Silkowitz, Assistant Attorney General, of counsel; Ms. Bello on the brief).
Harold G. Levison argued the cause for respondent (Mudge, Rose, Guthrie, Alexander & Ferdon, attorneys; Mr. Levison, of counsel; Carmen Saginario Jr., on the brief).
The opinion of the court was delivered by CONLEY, J.A.D.
Defendants appeal an order enforcing an arbitration provision contained in a "service agreement" between the County of Passaic and plaintiff. The agreement was for the construction and operation of a resource recovery facility. The County[1] procured the agreement pursuant to the "McEnroe Act", N.J.S.A. 13:1E-136 to -168, which requires, among other things, review and approval by several State agencies. Before the review process was completed, the County terminated the agreement, triggering plaintiff's request for arbitration on its claim for reimbursement of preconstruction costs. The trial judge concluded that although the agreement was terminated and was never approved by the State *432 agencies, an arbitration clause in the agreement was, nonetheless, enforceable. We hold that the arbitration provision of the terminated agreement does not apply to plaintiff's claim. However, we reject the contention of the State and the County that provisions of the agreement concerning the rights and obligations of the parties in the event of termination under the particular circumstances here are not viable absent agency approval. We caution that our holding that the parties may bind themselves to such provisions, notwithstanding that the McEnroe Act approval process was never completed, is limited solely to preconstruction provisions triggered under the peculiar circumstances that occurred here. We vacate the order enforcing arbitration and remand to permit the filing of an amended complaint[2] and further proceedings.
Enacted in 1985 as an amendment to the original State Solid Waste Management Act, N.J.S.A. 13:1E-1 to -135, the McEnroe Act was envisioned as a legislative measure to facilitate and encourage planning, construction and operation of resource recovery facilities (RRF) as part of the state solid waste management plan. As such, the Legislature recognized:
[T]hat to attract private investment capital for these waste-to-energy projects it is necessary to establish a favorable regulatory climate, which will at the same time insure safe, adequate and proper solid waste disposal service at just and reasonable rates; and that to encourage these joint public-private sector cooperative ventures it is also necessary to attain the most advantageous financial and programmatic scrutiny by the Legislature and agencies of State government. [N.J.S.A. 13:1E-136.]
There are two components of the Act. The first, N.J.S.A. 13:1E-138 to -152, establishes three new taxes on the disposal of solid waste at sanitary landfills in order to provide revenues for counties to shift from landfills to resource recovery facilities. The second part of the Act, N.J.S.A. 13:1E-153 to -168, establishes a *433 procurement procedure which "contracting units"[3] may use to enter into long-term contracts with private vendors for resource recovery services. See Senate Energy and Environment Committee Statement, A. 1778 (enacted as L. 1985, c. 38). See also Pollution Control Fin. Auth. v. Department of Envtl. Protection, 237 N.J. Super. 163, 167-68, 567 A.2d 243 (App.Div. 1989), aff'd, 123 N.J. 356, 587 A.2d 626 (1991).
It is the second prong of the Act that we here focus upon. Procurement of a contract under the Act does not require the competitive bidding strictures of the Local Public Contracts Law, N.J.S.A. 40A:11-1 to -49. To ensure, however, protection of the public interest, the Act establishes an extensive procedure that must be followed. The contracting unit must publish a "request for qualifications" which contains specific areas of inquiry, N.J.S.A. 13:1E-154, and interested vendors must satisfy such qualifications. Ibid. A request for proposals from qualified vendor must then be issued and must include certain mandated items. N.J.S.A. 13:1E-155. The contracting unit may then designate a vendor, or vendors, whose proposal is "the most advantageous to the public, taking into consideration price and the evaluation factors set forth in the request for proposals," N.J.S.A. 13:1E-157, and may begin negotiations with such vendor for a "proposed contract." Ibid. Certain contractual provisions are mandated. N.J.S.A. 13:1E-164.
After the contracting unit accepts a proposed contract, it must be reviewed by the Division of Rate Counsel, and reviewed and *434 approved by the Board of Public Utilities (now the Board of Regulatory Commissioners), the Division of Local Government Services, and the Department of Environmental Protection and Energy. N.J.S.A. 13:1E-158. In addition and simultaneous with such review, the proposed contract must also be submitted to a public hearing. N.J.S.A. 13:1E-161. The Act sets forth specific time frames for such review, approvals and public hearing. See N.J.S.A. 13:1E-160 to -163. As far as we can decipher, the review and approval process envisioned by the Legislature was intended to be accomplished within 120 days with additional time for further negotiations and addition public hearing in the event of a "conditional approval." See N.J.S.A. 13:1E-163.
Proceeding under the Act, in October 1985, the County issued a request for qualifications of interested vendors and proposals for the planning, construction, operation and management of a RRF. In July 1986, plaintiff was selected by the County as its "preferred vendor." A proposed service agreement was executed in September 1986 and submitted to the State agencies for approval in January 1987. It was originally agreed that construction would occur by July 1, 1989 and if it had not, either party could terminate.
From that time until the County terminated the agreement in July 1991, and for reasons that are not entirely clear to us, State agency approval was never obtained. Indeed it is not clear that any review required under N.J.S.A. 13:1E-163 was ever performed until after plaintiff filed its complaint and after the trial judge initially determined on June 26, 1991 that the matter should proceed to arbitration but stayed his order for 135 days to permit agency review. What does appear is that as permitted by N.J.S.A. 13:1E-160, certain discovery was initially requested by the reviewing agencies and responded to. In July 1990 BPU and DEPE requested supplemental discovery. Responses to these requests were provided in December 1990 and May 1991.
Meanwhile, plaintiff, for its part and by April 1989, had obtained from DEPE all of the necessary environmental permits to construct *435 and operate the RRF. One of those permits was a Prevention of Significant Deterioration (PSD) permit. The permit, required by federal law, was granted by DEPE pursuant to a delegation of authority from the U.S. Environmental Protection Agency (EPA). In doing so, DEPE determined that combustion controls, rather than EPA-required selective non-catalytic reduction of NO emissions, would be adequate. Pursuant to 40 C.F.R. § 124.19, this determination was reviewed by the EPA administrator and rejected. By the time the County terminated the agreement in July 1991, this issue still had not been resolved, as far as we can tell.
Other events as well transpired, including, we are told, a shift in DEPE policy from resource recovery mass burn incinerators to recycling. As a result, solid waste management districts were required to increase their recycling obligations from 25% to 60% of their waste stream. Resource recovery facilities were to be considered as a disposal method of last resort and they were to be regionalized. This change in policy, in part, formed the basis for the concerns over the agreement here expressed by BPU when it finally did review the proposal in August 1991.
In any event, the original construction date of July 1, 1989 was not met and the parties agreed to an extended date of July 1, 1991. By May 1991, it was apparent that date would also not be met. At the very least plaintiff still did not have a PSD permit and the State agencies had not yet approved the agreement. Plaintiff, then, requested a further extension of the construction date to February 1, 1993.
When the County's positive response did not appear to be forthcoming, plaintiff demanded reimbursement for millions of dollars it claimed it had expended in preconstruction costs. The County declined and on June 10, 1991 plaintiff then filed its complaint and order to show cause seeking arbitration pursuant to Section 9.03 of the service agreement on its claim for preconstruction costs which it contended the County owed under Section 3.06(d) of the agreement.
*436 On June 19, 1991 the County adopted a resolution incorporating its intent to terminate the proposed agreement by July 1, 1991 pursuant to Section 2.04 of the service agreement, unless all of the required conditions precedent were satisfied. Specifically, the County's resolution stated in part:
A. Notice is hereby formally provided to Foster Wheeler Passaic, Inc. that the Company is to, ON OR BEFORE JULY 1, 1991, secure, obtain and provide to the satisfaction of the County and the Authority all conditions precedent to construction under the terms of the proposed agreement including but not limited to:
1. Appropriate parent guarantees by Foster Wheeler Corporation in favor of the County of Passaic;
2. Applicable permits, licenses and authorizations necessary for the construction, start-up, testing and operation of the facility, including but not limited to, a facility PSD/final air permit;
3. A fully executed electrical sales contract;
4. McEnroe approval by the New Jersey Board of Public Utilities and other reviewing state agencies pursuant to N.J.S.A. 13:1E-136, et seq.
B. In the event that Foster Wheeler Passaic, Inc. is unable or fails to comply with the provisions of Section A above and does not meet all conditions precedent to construction under the terms of the proposed agreement, ON OR BEFORE JULY 1, 1991, said proposed agreement shall be and is hereby terminated in accordance with the provisions of Section 2.04 therein as modified by the 1989 proposed Memorandum of understanding, and all obligations of the County and Authority pursuant thereto concluded as of that date and WITHOUT FURTHER NOTICE TO THE COMPANY.
There is no dispute that the service agreement was effectively terminated prior to completion of the McEnroe Act procurement process and prior to commencement of construction. What the remaining rights and obligations of the parties are and by what procedure those rights and obligations, if any, may be resolved is what we must determine.
Resolution of this appeal requires both an analysis of the parties' agreement and an interpretation as to the extent to which the Legislature intended the approval process by the State agencies to affect the ability of the parties to agree to certain rights and obligations that might be triggered upon termination prior to completion of the approval process and prior to commencement of any construction. Critical to the former, are Sections 2.01, 2.04 and 3.06(d).
*437 Section 2.01, contained in Article II which governs "Conditions Precedent to Construction" provides:
All rights, obligations and liabilities of the parties hereunder shall be subject to the satisfaction or waiver of each of the following conditions precedent set forth below on or before the Construction Date; provided, however, that the Company may, in its sole discretion, commence the Work before the Construction Date but shall not be entitled to payment for such Work if the Construction Date does not occur. Notwithstanding the above, the rights and obligations of the County and the Company specified in Sections 2.04 and 3.06(d) shall be operative and in full force and effect as of the Contract Date. [Emphasis added to last sentence].
Among the required conditions precedent which the "rights, obligations and liabilities of the parties" were subject to, is the obtaining of all necessary permits, Section 2.02(e), and approval by the McEnroe Act agencies, Section 2.02(h), prior to the construction date. While plaintiff could pursuant to Section 2.01 begin work before the conditions were met, it would not be entitled to any payment "if the Construction Date does not occur." Thus, Section 2.01 provides that unless the conditions precedent are satisfied and the construction date met, neither party has any rights, obligations or liabilities. Critical to this appeal, there are two exceptions to that. The last sentence of Section 2.01 provides that the rights and obligations set forth in Sections 2.04 and 3.06(d) survive a termination based upon failure to meet the conditions precedent and the construction date.
Section 2.04, captioned "Satisfaction of Conditions Precedent," provides in pertinent part:
If the Construction Date has not occurred on or before July 1, 1989, then either party may, by notice in writing to the other party, terminate this Agreement. Neither party shall be liable to the other for the termination of this Agreement pursuant to this Section, and each of the parties shall bear its respective expenses attributable to the transaction herein contemplated. ... [Emphasis added].
The only exception contained in 2.04 for liability in the event of a termination based upon failure of the construction date to be satisfied concerns certain costs for issuance of bonds, not here involved. In the event, thus, of termination for failure to meet the construction date, neither party retains any obligations for the costs expended by the other, except certain bond costs.
*438 An exception to this, however, was agreed to in Section 3.06(d). That section provides in pertinent part:
If the Facility Site is determined to be unacceptable or unsuitable for the construction of the Facility, and the County elects pursuant to subsection 3.06(a) to solicit bids from and negotiate with a new vendor, or construction of the Facility is abandoned then the County is obligated for the reimbursement to the Company of (i) all project development and engineering costs incurred by the Company after the Contract Date in an amount not to exceed $2,500,000 for a one (1) year period commencing on the Contract Date plus $100,000 per month for each month after the end of said one year period until notice to the Company by the County that the Company should refrain from expending additional amounts on project development and engineering costs....
Thus, in the event the agreement were terminated because the construction date was not met, the parties would bear their own expenses (except certain bond expenses); but if the site were determined to be unacceptable or unsuitable for construction and the County determined to solicit bids from and negotiate with a new vendor or abandoned construction of the facility, then the County must reimburse plaintiff for its development and engineering costs.
It is Section 3.06(d) that plaintiff relies upon in claiming entitlement to preconstruction costs. The County, on the other hand, contends Section 3.06(d) is not involved because the facility site has never been deemed unacceptable or unsuitable and the County did not "abandon" the project for that reason, but rather terminated because all of the conditions precedent were never satisfied and the construction date, as a result, was not met. We need not resolve this issue for the merits of the parties' contractual claims are not before us.
In any event, what is clear to us is the total absence of any reference in Section 2.01 to a survival of the arbitration clause, Section 9.03, as a vehicle for resolution of these contractual claims. Neither is there any reference to the arbitration clause contained in Sections 2.04 or 3.06(d). Moreover, a comparison of the provisions in Article VIII, governing default and terminations, with Section 9.03 in Article IX, suggests that arbitration was envisioned as a vehicle for resolving disputes over obligations of *439 the parties as they occurred during the course of the contract. But in the event of a default and termination, the rights of the parties are specifically delineated in Article VIII which nowhere refers to arbitration as an alternative dispute resolution procedure. The specific remedies referred to are a suit for specific performance or a suit for damages at law. There is no "statutory or current philosophical bar to a contract clause which requires commercial arbitration of only certain disputes between the parties...." Kalman Floor Co., Inc. v. Jos. L. Muscarelle, Inc., 196 N.J. Super. 16, 28, 481 A.2d 553 (App.Div. 1984), aff'd, 98 N.J. 266, 486 A.2d 334 (1985).
In, nonetheless, granting plaintiff's application for arbitration, the trial judge said in critical part:
You get a company entering into a contract; they obviously spent tremendous sums of money in engineering and other start-up costs and legals and otherwise. The project in it's start-up phase is now continued in this case, five years or just about five years.
Ultimately, the project is not approved or it's abandoned; it doesn't go through for one reason or another, whether for legal reasons, budgetary reasons, environmental reasons, whatever.
The project is at an end and the plaintiffs in this case, the Company must have some rights to proceed against the County if they feel justified in making claim under Section 3.06(d) for those so called engineering and start-up costs.
I can't imagine how anyone would enter into such a contract without such a provision. If they can spend hundreds and hundreds of thousands of dollars or, perhaps, millions of dollars over a period of five years and then the project is gone and they just walk away. I don't understand that.
It is not entirely clear whether the trial judge was referring to Section 3.06(d) as surviving a failure to meet conditions precedent and termination, or survival of Section 9.03, or both. As to 9.03, however, the simple answer is that whatever else Sections 2.01, 2.04 and 3.06(d) may provide, they do not support a survival or application of Section 9.03. While that might have been a good thing to negotiate, we cannot make a better contract for the parties than they made for themselves. E.g. Karl's Sales and Serv., Inc. v. Gimbel Bros., Inc., 249 N.J. Super. 487, 493, 592 A.2d 647 (App.Div.), certif. denied, 127 N.J. 548, 606 A.2d 362 (1991). *440 We, thus, reverse the order directing that plaintiff's claim for preconstruction costs be submitted to arbitration.[4]
That does not, however, end our consideration, for we must determine whether the provisions the parties intended to survive are valid and enforceable absent McEnroe Act approval. Defendants argue they are not, contending that the County has no power to enter into a binding agreement without approval by the State agencies.
We begin with the understanding overlooked by defendants, that while the field of solid waste management has been preempted by the State, Southern Ocean Landfill, Inc. v. Township of Ocean, 64 N.J. 190, 194-95, 314 A.2d 65 (1974), neither the Solid Waste Management Act nor any other statutory provision preempts the authority of local governments to contract with vendors such as plaintiff for the provisions of various solid waste facilities within the overall context of the State plan and subject to the substantive provisions of the Solid Waste Management Act. Indeed, the McEnroe Act implicitly recognizes pre-existing authority to contract. In defining a "contracting unit," for instance, the Legislature obviously understood that counties, municipalities and bistate authorities would have such authority but recognized that other boards, commissions or committees which might wish to contract under the Act may not always have such authority. The definition, previously set forth supra note 3, specifically requires that such entities, to be considered "contracting units," have the "statutory power to ... enter into contracts or agreements...." A similar provision is not applied to counties, municipalities or *441 bistate authorities. See N.J.S.A. 40:14B-1 to -69; N.J.S.A. 40:66A-31.4.
Moreover, the Legislature expressly acknowledged that the McEnroe Act was not to be the exclusive means of procurement of a contract with a vendor. N.J.S.A. 13:1E-153 does not say all contracts for resource recovery services shall be procured pursuant to its terms. Quite to the contrary. It states in pertinent part:
The provisions of any other law, rule or regulations to the contrary notwithstanding, and as an alternative to any other procedure provided for by law or by order of the Board of Public Utilities, a contracting unit may enter into a contract with a vendor for the design, financing, construction, operation or maintenance, or any combination thereof, of a resource recovery facility, or for the provision of resource recovery services, pursuant to the provisions of this amendatory and supplementary act. [Ibid. (footnote omitted)].
The procurement procedure established by the McEnroe Act is explicitly an alternative to other available procedures, such as the Local Public Contracts Law. In the event the contract is obtained pursuant to the McEnroe Act, the requirements of the local public bidding law need not be complied with. Ironbound Comm. Against Toxic Waste v. Board of Chosen Freeholders, 230 N.J. Super. 133, 139, 553 A.2d 30 (App.Div.), certif. denied, 117 N.J. 64, 563 A.2d 828 (1989). But we do not read the McEnroe Act to preclude the County from contracting pursuant to the Local Public Contracts Law if it so chose to do. Of course, the parties would be subject to the substantive provisions of the Solid Waste Management Act, N.J.S.A. 13:1E-1 to -135.
We are not, moreover, overly impressed with the references in the provisions of the Act to "proposed contract" and the specific number of such references that defendants are quick to point out. This is because the Legislature defines "proposed contract" as "a contract negotiated by a contracting unit pursuant to the provisions of this amendatory and supplementary act...." N.J.S.A. 13:1E-137q. A "proposed contract" is, still, a "contract." It is a contract the parties enter into, subject to State agency approval.
*442 The role of the State agencies within the context of the contractual relationship of the parties is not quite as defendants posit. Implicit in their contention is that the Legislature has given these agencies the final authority to determine whether a contracting unit and a vendor do or do not have a binding contract on all aspects of their contractual relationship. We do not think that was the intent of the Legislature, at least as to the limited area we here deal with.
Because we view the specific language of the review process critical, we set forth those provisions in full. N.J.S.A. 13:1E-163 states in pertinent part:
a. Within 30 days of receipt of the hearing report submitted by a contracting unit pursuant to the provisions of subsection b. of section 27 of this amendatory and supplementary act, the department shall approve or conditionally approve the proposed contract submitted for review by the contracting unit pursuant to the provisions of this amendatory and supplementary act. The department shall approve the proposed contract if it finds that the terms of the proposed contract are consistent with the district solid waste management plan adopted pursuant to the provisions of the "Solid Waste Management Act," P.L. 1970, c. 39 (C.13:1E-1 et seq.) by the solid waste district to be served under the terms of the proposed contract. If the department conditionally approves the proposed contract, it shall state in writing the revisions which must be made to the proposed contract to receive approval, and the contracting unit may prepare and submit to the department a revised proposed contract. If the department determines that the revisions are substantial, the contracting unit shall hold a public hearing on the revisions pursuant to the provisions of section 26 and section 27 of this amendatory and supplementary act. In the alternative, the district solid waste management plan may be amended pursuant to law so as to be consistent with the terms of the proposed contract.
b. Within 30 days of receipt of the hearing report submitted by a contracting unit pursuant to the provisions of subsection b. of section 27 of this amendatory and supplementary act, the Division of Local Government Services shall approve or conditionally approve the proposed contract submitted by the contracting unit pursuant to the provisions of this amendatory and supplementary act. The division shall approve the proposed contract if it finds in writing that the terms of the proposed contract are in compliance with the provisions of section 29 of this amendatory and supplementary act, and that the terms of the proposed contract will result in the provision of services or facilities necessary for the health, safety, welfare, convenience or betterment of the recipients or users of these services or facilities, that the terms and provisions of the proposed contract are not unreasonable, exorbitant or impracticable, would not impose an undue and unnecessary financial burden on the citizens residing in or served by the contracting unit, and will not materially impair the ability of the contracting unit to punctually pay the *443 principal and interest on its outstanding indebtedness and to supply other essential public improvements and services, except that the division, in its review of the proposed contract, shall be bound by any applicable findings or determinations of the Local Finance Board made pursuant to the provisions of subsection d. of N.J.S. 40A:2-7 or section 7 of P.L. 1983, c. 313 (C.40A:5A-7). If the division conditionally approves the proposed contract, it shall state in writing the revisions which must be made to the proposed contract to receive approval, and the contracting unit may prepare and submit to the division a revised proposed contract. If the division determines that revisions are substantial, the contracting unit shall hold a public hearing on the revisions pursuant to the provisions of section 26 and section 27 of this amendatory and supplementary act.
c. Within 30 days of receipt of the hearing report submitted by a contracting unit pursuant to the provisions of subsection b. of section 27 of this amendatory and supplementary act, the Board of Public Utilities shall approve or conditionally approve the proposed contract submitted by the contracting unit pursuant to the provisions of this amendatory and supplementary act. The board shall approve the proposed contract if it finds in writing that the terms of the proposed contract are in the public interest. If the board conditionally approves the proposed contract it shall state in writing the revisions which must be made to the proposed contract to receive approval, and the contracting unit may prepare and submit to the board a revised proposed contract. If the board determines that the revisions are substantial, the contracting unit shall hold a public hearing on the revisions pursuant to the provisions of section 26 and section 27 of this amendatory and supplementary act. In reviewing and approving the contract, the Board of Public Utilities shall not determine a rate base for, or otherwise regulate the tariffs or return of, the proposed resource recovery facility. The board shall not, thereafter, conduct any further review of the contract. [Emphasis added. Footnotes omitted].
To be sure, the agency review and approval process is intended to meet the concerns that the interests of the public be preserved and the preemptive state solid waste management policies be adhered to. Thus, review by DEPE is to ensure that the terms of the proposed contract are consistent with the distinct solid waste management plan adopted pursuant to the Solid Waste Management Act. N.J.S.A. 13:1E-163a. The Board of Public Utilities review is designed to ensure the terms of the contract are in the public interest. N.J.S.A. 13:1E-163c. The Department of Community Affairs review ensures that the proposal contains the mandatory terms set forth in N.J.S.A. 13:1E-164 and that they are not "unreasonable, exorbitant or impracticable."
But as we pointed out previously, the overall tenor of the Act is in part to "attract private investment capital," establish a "favorable regulatory climate," and, "encourage these joint public-private *444 sector cooperative ventures." These objectives are important to any understanding of the role the Legislature fashioned for the State agencies' review.
Pursuant to N.J.S.A. 13:1E-163 and consistent with these objectives, the agencies "must approve or conditionally approve." There is no authority to disapprove. The Legislature knows how to so provide; indeed it has done precisely that in other sections of the Solid Waste Management Act. See N.J.S.A. 13:1E-24; N.J.S.A. 13:1E-60c(5), (9). Moreover, if the agencies conditionally approve, they must advise the parties of the revisions required for approval. The focus, then, is upon approval, with the ultimate authority to determine the terms of the contract still remaining with the contracting parties.
To be sure, without such approval a RRF cannot be constructed and operated under a McEnroe Act contract. But interestingly, there is no statutory provision that without approval, the parties cannot agree to their respective rights and liabilities in the event the intended project terminates before the approval process runs its course. We do not suggest that a county and a vendor may forge ahead and construct and operate a RRF without satisfying the concerns expressed by the State agencies in, for instance, a conditional approval. But, as we have previously said, we are concerned here only with rights and obligations in the event the deal falls through and does not reach the stage of agency approval or conditional approval and prior to any construction. Under these circumstances, we do not think the Legislature has precluded the parties from agreeing to certain limited damage provisions. If we are wrong in our interpretation of the Act, we invite the Legislature to amend it to specifically provide that no terms of a proposed agreement can be enforceable without prior agency approval. But until such time, we do not view the Act as so providing, at least as to the provisions here involved.
*445 The order directing arbitration is vacated. The matter is remanded for further proceedings consistent with this opinion.[5]
NOTES
[1] Defendant Passaic County Utilities Authority is the implementing agency for the County and a signatory on the agreement. Reference in this opinion to the County incorporates reference to the PCUA.
[2] Plaintiff's complaint and order to show cause does not contain a count for breach of contract, but rather was brought solely under N.J.S.A. 2A:24-1 to -11.
[3] "Contracting unit" as defined by the Act means "any county; any municipality; any bistate authority; or any board, commission, committee, authority or agency, which is not a State board, commission, committee, authority or agency, and which has administrative jurisdiction over any district other than a school district, project, or facility, included or operating in whole or in part, within the territorial boundaries of any county or municipality, which exercises functions which are appropriate for the exercise by one or more units of local government, and which has statutory power to make purchases and enter into contracts or agreements for the performance of any work or the furnishing or hiring of any materials or supplies usually required...." N.J.S.A. 13:1E-137b.
[4] This determination renders moot the State's contention that the trial judge was required to defer to BPU's belated disapproval of the arbitration clause as contrary to the public interest. We note, however, and as we will explain more fully, the mandate of the agencies is to approve or conditionally approve. If only conditional approval is given, the agencies must explain what the concerns are and what changes must be made to obtain approval. See N.J.S.A. 13:1E-163. We do not view BPU's response as fulfilling that mandate.
[5] Our decision that although the arbitration clause cannot be enforced, section 2.04 and 3.06(d) survive renders moot any consideration of the trial judge's alternative reliance upon Section 9.08 and equitable estoppel considerations.